FRANKIE SUE DEL PAPA, Attorney General, Appellant, v. THE BOARD OF REGENTS OF THE UNIVERSITY and COMMUNITY COLLEGE SYSTEM OF NEVADA, Respondent.

No. 28966

April 9, 1998                                        956 P.2d 770

*Frankie Sue Del Papa*, Attorney General and *Robert L. Auer*, Deputy Attorney General, Carson City, for Appellant.

*Thomas J. Ray*, General Counsel for the Board of Regents of the University and Community College System of Nevada, Reno, for Respondent.

*Lionel, Sawyer & Collins* and *Kevin D. Doty*, Las Vegas, for Amicus Curiae.

# OPINION

By the Court, MAUPIN, J.:

This is an appeal from an order of summary judgment in an action to enforce Nevada's Open Meeting Law. Appellant, the Attorney General, contends that the district judge erred in determining as a matter of law that telephone polling does not constitute a meeting under any circumstances. We agree. However, we affirm on other grounds the district judge's decision to dismiss the action.

## *FACTS*

Nancy Price is a duly elected member of the Board of Regents (hereinafter "the Board") for the University and Community College System of Nevada (hereinafter "the University"). On several occasions prior to April 5, 1992, Price made comments to the press criticizing the conduct of her fellow Regents. In these public statements, she objected to the process by which the Board selected an external auditor and the processes by which the presidents of the University of Nevada, Las Vegas, and the Western Nevada Community College were selected. Thereafter, at least seven Board members individually expressed their concerns about these comments to the chairman, James Eardley.

On April 5, 1995, Eardley met with Constance Howard, Interim Director of Public Information for the University. Eardley asked Howard to draft a response to Price's comments. Howard then drafted a "media advisory."

After Eardley reviewed the media advisory, it was disseminated by facsimile transmission to all of the Board members except Price. The draft advisory stated:

> The individual members of the University and Community College System of Nevada Board of Regents wish to express their concern and opinion that recent statements to the media by Regent Nancy Price are unsubstantiated, incorrect and potentially damaging to the Board *and the University System*

*as a whole.* While the members of the Board respect the right of any one member to express his or her opinions, it is their sense that some of Regent Price's comments go beyond opinion and are, in fact, unsubstantiated accusations of wrong doing. *The members of the Board feel it is important to protest publicly against these statements in the interests of protecting the integrity of the Board and its policy-making role for Nevada's higher education system.*

(Emphasis added.)

A memorandum written by Howard accompanied the draft advisory requesting feedback on the draft, and seeking advice as to whether the proposed course of action should be pursued. The memorandum further indicated Eardley's two-fold purpose in issuing the advisory: to protest some of Price's earlier comments and to seek more balanced coverage from the media. Finally, the memorandum stated that no release would occur without Board approval.

On April 5, 1995, the recipients of the draft advisory responded by way of telephone calls to either Eardley, Howard, or both. These calls were charged to University calling cards. Some of the Regents who responded disagreed with the use of their names and, in varying degrees, to the language of the advisory itself.[1] On April 6, 1995, Eardley decided not to issue the advisory.

After receiving a complaint from Regent Price regarding these facsimile transmissions and telephone calls, the Attorney General filed the instant lawsuit. Four counts of the Attorney General's complaint charged the Regents with violating the Open Meeting Law by deciding whether to release the draft privately by "fax" and telephone rather than by public meeting. The other two counts alleged that the Regents had conducted a closed meeting to consider the character, alleged misconduct and professional competence of Price without giving her notice of the meeting. The Attorney General sought to establish violations of several sections of NRS chapter 241. She also sought injunctive relief prohibiting the Regents from repeating those violations, and a judgment voiding the result of the non-public poll. The district court granted summary judgment in the Board's favor on these issues.

## DISCUSSION

In 1993, NRS 241.020(1) provided that "all meetings of public bodies must be open and public, and all persons must be permit-

---

[1]Of the ten Regents who received the facsimile transmission, five responded in favor of releasing the advisory, one wanted it released under Eardley's name only, one was opposed to releasing the advisory, two had no opinion, and one did not respond.

ted to attend any meeting of these bodies." NRS 241.020(1) (amended 1995).[2] The term " '[m]eeting' means the gathering of members of a public body at which a quorum is present to deliberate toward a decision or to make a decision on any matter over which the public body has supervision, control, jurisdiction or advisory power."[3] NRS 241.015(2) (1995).[4] Furthermore, "electronic communication . . . must not be used to circumvent the spirit or letter of [NRS chapter 241] in order to discuss or act upon a matter over which the public body has supervision, control, jurisdiction or advisory powers." NRS 241.030(4).

The Attorney General argues that the district court erred in determining as a matter of law that these individual telephone calls and faxes between Regents and/or their employees did not constitute a "meeting" as defined by NRS chapter 241.

### 1. *Statutory Construction*

"The construction of a statute is a question of law." General Motors v. Jackson, 111 Nev. 1026, 1029, 900 P.2d 345, 348 (1995). "Courts must construe statutes . . . to give meaning to all of their parts and language. . . . The court should read each sentence, phrase, and word to render it meaningful within the context of the purpose of the legislation." Board of County Comm'rs v. CMC of Nevada, 99 Nev. 739, 744, 670 P.2d 102, 105 (1983) (citations omitted). "A statute should always be construed to avoid absurd results." *General Motors,* 111 Nev. at 1029, 900 P.2d at 348.

"Where the language of a statute is plain and unambiguous, and its meaning is clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself." State v. Jepsen, 46 Nev. 193, 196, 209 P. 501, 502 (1922), *quoted in* Charlie Brown Constr. Co. v. Boulder City, 106 Nev. 497, 503, 797 P.2d 946, 949 (1990). "It is well settled in Nevada that words in a statute should be given their plain meaning unless this violates the spirit of the act." McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986) (hereinafter *"McKay"*).

---

[2]The current version of NRS 241.020(1) is virtually identical to the 1993 version.

[3]The legislature is specifically exempt from the mandates of the Open Meeting Law. NRS 241.015(3) (a public body does not include the legislature of the State of Nevada).

[4]NRS 241.015(2) was NRS 241.015(1) in 1993.

The Board argues that a meeting could not have taken place because a quorum of the members was not "present" to make the decision. It claims that the term "present" means "in view" or "at hand." *Webster's New Collegiate Dictionary* 910 (1975). The Board further argues that it was neither "in view" nor "at hand" because the words "at hand" are defined as "near in time or place." *Webster's New Collegiate Dictionary* 514 (1980). However, the term "present" is also defined as "within reach, sight or *call*." *Webster's Third New International Dictionary*, 1783 (1968) (emphasis added).

The Attorney General, in a 1985 opinion, interpreted the term "present" as follows:

> [W]here . . . the members of a public body agree that action will be taken by that body through the use of a predetermined mail poll procedure, the members of the public body should be treated by the law as "present" to conduct business. This conclusion is especially warranted in circumstances such as are presently considered where the members have consented in advance to be ready in mind, if not physically, to deliberate and decide public business in private without the statutorily mandated scrutiny of a public meeting. . . . Under these circumstances, a mail balloting by a public body would constitute a meeting within the statutory purview of NRS 241.015(1).

85-19 Op. Att'y Gen. 90, 92 (1985).

Thus, the term "present" can logically be interpreted in different ways. "Where a statute is capable of being understood in two or more senses by reasonably informed persons, the statute is ambiguous." *McKay,* 102 Nev. at 649, 730 P.2d at 442. Once the statute is deemed ambiguous, the plain meaning rule has no application and "[t]he leading rule of statutory construction is to ascertain the intent of the legislature in enacting the statute. . . . This intent will prevail over the literal sense of the words. . . . The entire subject matter and policy may be involved as an interpretive aid." *Id.* at 650-51, 730 P.2d at 442-43.

### 2. *Legislative Intent*

The purpose of this legislation is set forth at NRS 241.010 which provides that "[i]n enacting this chapter, the legislature finds and declares that all public bodies exist to aid in the conduct of people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly."

This court has held that "[t]he spirit and policy behind NRS chapter 241 favors open meetings." *McKay,* 102 Nev. at 651, 730 P.2d at 443. "[T]he intent of the law [is] that the actions and deliberations of public bodies be taken *openly." Id.*

An examination of legislative history is also useful to determine legislative intent. United States v. James, 478 U.S. 597, 606 (1986); *see also* McKay v. Board of Cty. Comm'r, 103 Nev. 490, 492 n.2, 746 P.2d 124, 125 n.2 (1987) (failure to adopt a proposed amendment is evidence of legislative intent to the contrary).

NRS chapter 241 was adopted in 1960 and revised dramatically in 1977. In 1977, the legislature adopted the current definition of the term "meeting." *See* NRS 241.015(2). In doing so, it considered two bills, A.B. 437 and S.B. 333. The legislature specifically considered the issue raised in this case in 1981 and again in 1995. Additionally, the Attorney General has, either by opinion or instruction, considered this issue in 1980, 1983, 1985 (*see* 85-19 Op. Att'y Gen. 90 (1985), *supra,* (prohibiting mail polling), 1988, and 1991.

### a. *A.B. 437 and S.B. 333 (1977)*

The first draft of A.B. 437, submitted on March 10, 1977, proposed to define a "meeting" as the

> gathering of members of a public body at which a quorum is present to deliberate toward a decision or to make a decision on any matter over which the public body has supervision, control, jurisdiction or advisory power.

A.B. 437, 59th Leg. (Nev. 1977). On March 16, 1977, Deputy Attorney General Bill Isaeff testified before the Assembly Governmental Affairs Committee. He opined that the definition of meeting should include telephone conference calls or communication by electronic means. *See* Hearing on A.B. 437 Before the Assembly Governmental Affairs Committee, 59th Leg. (Nev. 1977). Other witnesses also recommended that the committee include electronic means of communication in the definition of a "meeting." *Id.*

The first reprint of S.B. 333 proposed to define a "meeting" as "the gathering of a quorum of the constituent membership of a public body, whether in one place *or by electronic means,* to discuss or act upon a matter over which the body has supervision, control, jurisdiction or advisory power." S.B. 333, 59th Leg. (Nev. 1977) (emphasis added). The legislature ultimately adopted the current version of NRS 241.030(4), prohibiting only the use

of electronic communication to "circumvent the spirit" of chapter 241.

The Board argues, and the district court agreed, that enactment of the first version of A.B. 437, the rejection of S.B. 333, and the apparent rejection of testimony specifically proposing that electronic communications be considered "meetings" when used by a quorum to make decisions demonstrates the legislature's intent not to prohibit the electronic communications utilized in this case.

The Attorney General argues that the legislature enacted 241.030(4) in response to the concerns raised at the hearings on these proposed measures. She contends that even if the communications in this case did not constitute a "meeting" under NRS 241.015(1), they circumvented the requirement that the Board's decisions be made in public and violated the spirit of the Open Meeting Law. NRS 241.030(4).

### b. *1980 Open Meeting Law Manual*

Every few years the Attorney General publishes a Nevada Open Meeting Law manual consisting of questions and answers regarding NRS chapter 241. In 1980, question 18 stated: "May a public body convene a 'meeting' through the use of a telephone conference call?" The answer was given as follows:

> Nothing in the Open Meeting Law appears to prohibit the members of a public body from discussing public business via a telephone conference call in which a quorum of the members are simultaneously linked to one another telephonically. However, since this is a "meeting," the . . . public must have an opportunity to listen in on the discussions and votes taking place. . . . Although a telephone conference call may be a lawful method of conducting the public's business, it should never be used as a subterfuge to compliance with the Open Meeting Law and its stated intent that the actions of public bodies are to be taken openly and their deliberations conducted openly.

Richard H. Bryan, *Open Meeting Law Manual* 15 (3d ed. 1980).

Question 19 asked, "May a public body make a decision (vote) by a mail or telephone poll?" The Attorney General gave the following answer:

> In view of the legislative declaration of intent found at NRS 241.010 to the effect that all actions of public bodies are to be taken openly, the making of a decision by a mail poll which is not subject to public attendance appears inconsistent with both the spirit and intent of the law. The same is

true for a telephone poll, unless it is conducted as a telephone conference call in accordance with the requirements noted in Question and Answer No. 18, supra.

*Id.*

### c.  *A.B. 641 (1981)*

In addition to the legislature's consideration of electronic communication in 1977, the Board of Regents requested that the legislature consider A.B. 641 during the 1981 legislative session. That bill proposed to allow the Regents to "make investment decisions between its regularly scheduled meeting by means of a vote conducted by telephone." A.B. 641, 63rd Leg. (Nev. 1981). One of the Board's attorneys testified before the Assembly Governmental Affairs Committee on May 19, 1981. He stated that the Board's main concern was that "the provision in the open meeting law . . . simply prohibits these types of votes being taken between regularly scheduled meetings and the attorney general's manual clearly says you don't have telephone votes." Hearing on A.B. 641 Before the Assembly Governmental Affairs Committee, 63rd Leg. (Nev. 1981). Thus, it appears the Board was conceding at that time that telephonic voting was violative of the Open Meeting Law. Although the Board's attorney assured the committee that the Board would never use the measure as a license to make policy over the telephone, the committee ultimately voted to indefinitely postpone further activity on A.B. 641. Thus, the Regents' proposal never became law.

This court has held that " '[w]here . . . the legislature has had ample time to amend an administrative agency's reasonable interpretation of a statute, but fails to do so, such acquiescence indicates the interpretation is consistent with legislative intent.' " Hughes Properties v. State of Nevada, 100 Nev. 295, 298, 680 P.2d 970, 972 (1984) (quoting Summa Corp. v. State Gaming Control Bd., 98 Nev. 390, 392, 649 P.2d 1363, 1365 (1982)); *see also* Roberts v. State of Nevada, 104 Nev. 33, 39, 752 P.2d 221, 225 (1988). The legislature has had sixteen years to override the Attorney General's interpretation of NRS 241.015(1) and 241.030(4) via amendment. This it has failed to do, notwithstanding the specific opportunity in 1981. We therefore conclude that the rejection of A.B. 641 is evidence of the legislature's intent to preserve the Attorney General's interpretation of the law that voting by telephone to make a public decision, whether that decision is to act or not, violates the Open Meeting Law.

### d.  *1983, 1988, and 1991 Open Meeting Law Manuals*

In 1983, 1988 and in 1991, the Attorney General published

open meeting law manuals. In each, the Attorney General, using the questions and answers found in the 1980 *Open Meeting Law Manual,* stated that it was of the opinion that a public body may not, without the opportunity for public attendance, make a decision (vote) by telephone poll. Brian McKay, *Open Meeting Law Manual* 18 (4th ed. 1983); Brian McKay, *Open Meeting Law Manual* 23-24 (5th ed. 1988); Frankie Sue Del Papa, *Open Meeting Law Manual* 25 (6th ed. 1991).

### e.  *A.B. 602 (1995)*

In the 1995 legislative session, Nevada's Open Meeting Law was once again before the legislature. A.B. 602, 68th Leg. (Nev. 1995). A.B. 602 proposed that NRS 241.030(4) read as follows:

> [E]lectronic communication or polling, must not be used to circumvent the spirit or letter of this chapter in order to discuss or act upon any matter.

*Id.*   Although several witnesses spoke before the committee expressing their concerns about polling and its impact on the open meeting requirement, the 1995 legislature did not pass A.B. 602.

The legislature has rejected language defining electronic communications as a "meeting." Further, it has refused to specifically prohibit the telephonic polling for the purpose of enacting policy or measures within the scope of the public business. This notwithstanding, the legislature has consistently maintained that electronic communications shall not be used to circumvent the spirit or letter of chapter 241 in order to discuss or act upon a matter over which the public body has supervision, control, jurisdiction or advisory powers. It has also refused to amend the Attorney General's position that telephone polling circumvents the spirit and letter of the law. Thus, we believe that the legislature intended to prohibit public bodies from making decisions via serial electronic communications.

### 2.  *Case Authority*

In State ex rel. Stephan v. County Commissioners, 866 P.2d 1024, 1026 (Kan. 1994), the Kansas Supreme Court held that telephone calls between a quorum of county commissioners for the purpose of discussing county business did not constitute "meetings" within the meaning of the Kansas Open Meeting Act.[5] In that case, the Kansas Supreme Court held that the calls

---

[5]When *Stephan* was decided, Kansas did not have a statute analogous to NRS 241.030(4), but defined the term "meeting" as follows:

> As used in this act, "meeting" means any prearranged gathering or assembly by a majority of a quorum of the membership of a body or

did not constitute a meeting because, in 1977, the Kansas legislature rejected the following senate bill:

> No chance meeting, social meeting or electronic or written communication shall be used in circumvention of the spirit or requirements of this act.

*Id.* at 1026. That court stated that "[c]learly, then, these four alternative opportunities for communication were not contemplated to be within the term 'meeting' in K.S.A. 75-4317." *Id.* at 1027.

In concluding that the Board's actions in this matter did not constitute a "meeting," the district court relied heavily on *Stephan*. The Attorney General argues that *Stephan* is distinguishable because at the time that case was decided, Kansas did not have legislation analogous to NRS 241.030(4), prohibiting circumvention of the "spirit" of the Open Meeting Law via electronic communication. We agree. In this case, our legislature has enacted language almost identical to that rejected by the 1977 Kansas legislature.[6] Thus, we believe that *Stephan* inferentially supports the Attorney General's position in this matter.

The issue in Stockton Newspapers v. Members of Redevelopment Agency, 214 Cal. Rptr. 561, 562 (Ct. App. 1985), was "whether a series of nonpublic telephone conversations, each between a member of the governing body of a local agency and its attorney, for the commonly agreed purpose of obtaining a collective commitment or promise by a majority of that body concerning public business, constitutes a 'meeting' within the purview of the act." In reversing a grant of summary judgment for the redevelopment authority, the California court stated:

> Defendants argue that because the alleged telephone conversations were conducted serially as opposed to simultaneously as in the case of a "speaker phone" conference call among a majority of the members, the case falls within the statutory exception to the open meeting requirement where less-than-a-quorum of the governing body is at any one time involved. . . . [A] series of nonpublic contacts at which a

---

agency subject to this act for the purpose of discussing the business or affairs of the body or agency.
K.S.A. 75-4317(a).

[6]In response to *Stephan*, the Kansas Legislature enacted K.S.A. 75-4317(a) (1995) which states:

Meeting defined. (A) As used in this act, "meeting" means any gathering, assembly, telephone call or any other means of interactive communication by a majority of a quorum of the membership of a body or agency subject to this act for the purpose of discussing the business or affairs of the body or agency.

quorum of a legislative body is lacking at any given time is proscribed by the Brown Act if the contacts are "planned by or held with the *collective concurrence* of a quorum of the body to privately discuss the public's business" either directly or indirectly through the agency of a nonmember.

*Id.* at 565 (quoting 65 Op. Att'y Gen. 63, 66 (Cal. 1982)) (emphasis added).[7] The *Stockton Newspapers* court felt that "if face-to-face contact of the members of a legislative body were necessary for a 'meeting,' the objective of the open meeting requirement of the Brown Act could all too easily be evaded." *Id.*

In Roberts v. City of Palmdale, 853 P.2d 496 (Cal. 1993), the California Supreme Court held that "a concerted plan to engage in collective deliberation on public business through a series of . . . telephone calls passing from one member of the governing body to the next would violate the open meeting requirement." *Id.* at 503.

The Board contends that the California cases are in direct conflict with McKay v. Board of County Commissioners, 103 Nev. 490, 746 P.2d 124 (1987) (hereinafter *"Commissioners"*), and thus, inapplicable in Nevada. In *Commissioners*, this court held that the Board of County Commissioners violated the Open Meeting Law when it conducted public business (settlement of legal action) in a closed meeting with its attorney. We reasoned that, without a specific statutory exception to the Open Meeting Law, it is not the court's place to interfere with the legislature's clear intent that "[a] public body that meets as a body must meet in public" regardless of whether the body's attorney is present. *Id.* at 495, 746 P.2d at 127. We went on to say that, because this requirement might create some measure of frustration or inconvenience in a public board's legal dealings,

---

[7]At the time *Stockton Newspapers* was decided, the Brown Act provided:

> All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency . . . .

Cal. Govt. Code § 54953 (1953). In 1994, the California legislature added the following language to the Brown Act:

> (a) As used in this chapter, "meeting" includes any congregation of a majority of the members of the legislative body at the same time and place to hear, discuss or deliberate upon any item that is within the subject matter jurisdiction of the legislative body or the local agency to which it pertains.
>
> (b) . . . [A]ny use of direct communication, personal intermediaries, or technological devices that is employed by a majority of the members of the legislative body to develop a collective concurrence as to action to be taken on an item by members of the legislative body is prohibited.

Cal. Govt. Code § 54952.2 (1994).

> [n]othing whatever precludes an attorney for a public body from conveying sensitive information to the members of a public body by confidential memorandum; nor does anything prevent the attorney from discussing sensitive information in private with members of the body, singly or in groups less than a quorum.

*Id.* at 495-96, 746 P.2d at 127.

The above language in *Commissioners* does not stand for the proposition that members of a public body may vote individually in the physical absence of a quorum. Rather, in an attempt to preserve as much of the attorney-client relationship as possible, it simply reiterates that individual members may *discuss* sensitive information privately with counsel. While properly implying that members of a public body may ultimately make decisions on public matters based upon individual conversations with colleagues, it reiterates that the collective process of decision making, whether legal counsel is present or not, must be accomplished in public. *See again, generally Stockton Newspapers,* 214 Cal. Rptr. 561 (Ct. App. 1985) (individual telephone calls with attorney to obtain collective promise concerning public business violated open meeting law).

Based on the foregoing legislative history and case law, we hold that a quorum of a public body using serial electronic communication to deliberate toward a decision or to make a decision on any matter over which the public body has supervision, control, jurisdiction or advisory power violates the Open Meeting Law. That is not to say that in the absence of a quorum, members of a public body cannot privately discuss public issues or even lobby for votes. However, if a quorum is present, or is gathered by serial electronic communications, the body must deliberate and actually vote on the matter in a public meeting.

Here, it is undisputed that a quorum of the members of the Board participated in the decision not to release the advisory. Thus, the Board's interaction was more than a simple public response to Price's comments by one or more of the Regents. Such a response would not have implicated the Open Meeting Law regardless of whether a quorum of the Board was involved. The constraints of the Open Meeting Law apply only where a quorum of a public body, *in its official capacity as a body,* deliberates toward a decision or makes a decision.

In this case, the chairman of the Board chose to invoke the

services of the interim director of public information for the University to draft the advisory, and the Regents responded to the draft by calling Eardley on their University-paid calling cards. Further, the draft expressed the Regents' concern that Price's statements were "damaging to the Board and the University System as a whole." Most importantly, the draft protested Price's statements "in the interests of protecting the integrity of the Board and its policy-making role for Nevada's higher education system."

Because the Board utilized University resources, because the advisory was drafted as an attempted statement of University policy, and because the Board took action on the draft, we hold that the Board acted in its official capacity as a public body. Thus, insofar as a quorum of the Board chose to take a position on the advisory, yea or nay, via a non-public vote, it violated the Open Meeting Law.[8] Specifically, it violated NRS 241.010, 241.015, and 241.020, prohibiting closed meetings and requiring written notice of public meetings; NRS 241.030(4), prohibiting the use of electronic communications to circumvent the spirit or letter of the Open Meeting Law; and NRS 241.035, requiring a public body to keep written minutes of its meetings.[9]

The Attorney General asked the district court to establish that the Regents violated the above cited provisions of the Open Meeting Law, and for an injunction prohibiting the Regents from repeating those violations. She also asked that the district court void the result of the non-public poll pursuant to NRS 241.036.[10]

Because the Board decided not to take any action with respect

---

[8]Although the Board chose not to issue the release, our decision on the merits of this appeal is not moot because the issue resolved is "capable of repetition yet evading review." *See, e.g.*, Binegar v. District Court, 112 Nev. 544, 548, 915 P.2d 889, 892 (1996).

[9]The Attorney General also asked the district court to find a violation of NRS 241.031, prohibiting a public body from holding a closed meeting to consider the character, alleged misconduct, professional competence, or physical or mental health of an elected member of a public body; and a violation of NRS 241.033, prohibiting a public body from holding any meeting to consider the above items without written notice to the elected member under consideration.

We hold that the Board did not consider Price's character, alleged misconduct, professional competence, or physical or mental health in this case. Therefore, the Board did not violate NRS 241.031 or 241.033 when it decided not to release the advisory.

[10]NRS 241.036 provides that "[t]he action of any public body taken in violation of any provision of this chapter is void."

to the press release, NRS 241.036 is inapplicable. Thus, the Attorney General's only remedy is for this court to order the district court to enjoin the Board from engaging in future conduct that would violate the Open Meeting Law.

In Board of Public Instruction of Broward County v. Doran, 224 So. 2d 693 (Fla. 1969), *cited with approval in* City Council of Reno v. Reno Newspapers, 105 Nev. 886, 890, 784 P.2d 974, 976 (1989), the court stated:

> While it is well established that courts may not issue a blanket order enjoining any violation of a statute upon a showing that the statute has been violated in some particular respects (*see* Moore v. City Dry Cleaners & Laundry, 41 So. 2d 865 (Fla. 1949)), . . . they do possess authority to restrain violations similar to those already committed. *See* Interstate Commerce Commission v. Keeshin Motor Express, 134 F.2d 228 (C.C.A. Ill. 1943). This Court may enjoin violations of a statute where one violation has been found if it appears that the future violations bear some resemblance to the past violation or that danger of violations in the future is to be anticipated from the course of conduct in the past. *See* National Labor Relations Board v. Express Publishing Company, 312 U.S. 426, 437, 61 S. Ct. 693, 700, 85 L. Ed. 930 (1941).

*Id.* at 699-700.

In *Reno Newspapers,* this court examined the propriety of a district court's order permanently enjoining the city council from "conducting any closed meetings in the future for the purpose of selecting a public officer" after it selected a city manager in a closed meeting. Relying on *Doran,* this court stated:

> The district court had a clear indication that the City of Reno had violated Nevada's Open Meeting Law. Coupled with the Council's stipulation to a judgment that would enjoin it from violating the Open Meeting Law in the future selection of public officers, this provided sufficient specificity and basis for entering the permanent injunction.

*Reno Newspapers,* 105 Nev. at 890, 784 P.2d at 977.

Accordingly, the district court has the authority to restrain the Board from authorizing press releases via electronic communication regarding Board and University policy. While we have chosen to decide this issue because if left unresolved, it is capable of repetition yet evading review, we agree with the district court that an injunction is not necessary at this time. In light of our ruling today, danger of similar violations in the future should be

unlikely. Consequently, we conclude that the district court did not err in declining to enter an injunction.

Therefore, although the Board violated the Open Meeting Law, the district court properly dismissed the case even though the lower court relied upon the wrong reasons.[11] Accordingly, we affirm the judgment of the district court.[12]

SHEARING and ROSE, JJ., concur.[13]

ROSE, J., concurring:

I concur only to address the errors made or misimpressions left by the dissent. In support of his dissent, JUSTICE SPRINGER cites

---

[11]*See* Hotel Riviera, Inc. v. Torres, 97 Nev. 399, 403, 632 P.2d 1155, 1158 (1981) (holding that if the result below is correct, it will not be disturbed on appeal).

[12]The dissent, in our view, impliedly criticizes the initiation and maintenance of the instant proceedings. First, it is the obligation of the Attorney General to enforce the Nevada Open Meeting Law. This, of course, was the thrust of this suit. Secondly, the Board's action on the draft media advisory was not, as argued in dissent, "merely" part of an effort to defend personal reputations; rather, the action dealt with an attempt, as the advisory stated, to protect "the integrity of the Board and its policy-making role for Nevada's higher education system."

The dissent wonders at our reliance on the Board's utilization of University resources in connection with the draft advisory. This is mentioned only to underscore the fact that the Board members involved felt, obviously in good faith, that a determination of University policy was involved, to wit: whether a formal "Board" response to Ms. Price's public comments was necessary.

The members of the Board of Regents affected by Ms. Price's public statements had every right to respond thereto, as individuals or as a group. It was only when they attempted to respond in an official capacity that the Open Meeting Law was implicated. The members of the Board have no reason, as the dissent suggests, to take this decision as a personal affront to their dedication as public servants. They know that matters such as these come with ascension to public office.

The rhetorical excesses of the dissent obscure the legitimate debate over whether a violation of the open meeting legislation has occurred. The allegations that the decision making processes in this case were corrupted by the desires of a sitting supreme court justice to repay past political debts are flawed in a number of ways. First, the allegations are patently unfair to the other justices participating in the majority. Second, any issues that may have existed relative to possible disqualification have been previously resolved. Third, although the issues raised in the dissent relative to the participation of members of this court are clearly now in the public domain, no party to this action has suggested that any disqualification issues exist.

It is our intent to now lay to rest the former controversies that have plagued this court over recent years. Thus, we relegate our response to the dissent to this footnote.

[13]THE HONORABLE CLIFF YOUNG, Justice, voluntarily recused himself from participation in the decision of this appeal.

JUSTICE YOUNG's and my dissent in O'Brien v. State Bar, 114 Nev. 71, 952 P.2d 952 (1998), and our belief that two members of the Board of Governors had cast tainted votes in electing a representative to the Nevada Judicial Discipline Commission. While I am flattered that JUSTICE SPRINGER would cite our dissent, he certainly did not like our conclusion because he was part of the O'Brien majority. It is misleading to favorably cite our O'Brien dissent without disclosing the fact that JUSTICE SPRINGER previously rejected its reasoning and helped establish a much different standard in this area of the law.

JUSTICE SPRINGER claims in his dissent that there is nothing in the record of O'Brien, or anywhere else, to establish that FitzSimmons and Waters contributed more than $10,000 to Judge Steve Jones' 1996 election bid for the Nevada Supreme Court. FitzSimmons and her husband are listed as each contributing $10,000 in Judge Steve Jones' 1996 Campaign Disclosure Forms filed with the Nevada Secretary of State. Waters admitted to making large additional contributions in a motion to disqualify JUSTICE YOUNG filed on December 16, 1996 in the Whitacre case. In that motion, Waters stated as follows: "Kermitt L. Waters, his wife Jan Waters, and Nevada corporations owned by Mr. Waters contributed substantially to Judge Jones' campaign. The approximate aggregate amount of campaign contributions from those sources is $75,000.000 [sic]. Ms. FitzSimmons and her husband, John Lambrose, each contributed $10,000 to the Steve Jones campaign." Whitacre Inv. Co. v. State, Dep't Transp., Docket No. 29401 (Appellant's Motion to Disqualify JUSTICE C. CLIFTON YOUNG at 4, December 16, 1996).

JUSTICE SPRINGER once again raises the contention that I should not be sitting on this case because of a conflict of interest created by the Attorney General's involvement. This court has previously rejected this contention. In the processing of the case of Hogan v. Warden, 112 Nev. 553, 916 P.2d 805 (1996), Hogan made a motion to disqualify me for the same reasons stated by the dissent. The Court entered an order on February 18, 1994, rejecting Hogan's contentions "in their entirety." This order was unanimous and signed by JUSTICE SPRINGER. Now, four years later, JUSTICE SPRINGER again raises this issue sua sponte. Perhaps it is because he has forgotten the action taken four years ago, or is raising it for some other reason. Suffice it to say, this issue was considered and rejected by the full court many years ago.

SPRINGER, C. J., dissenting:

The Attorney General filed, in her own name, charges against the Board of Regents, complaining that all of the members of the Board ("excluding Nancy Price") were guilty of violating the

open meeting law. The Attorney General's complaint sought an injunction "prohibiting the Regents from repeating the violations of the law."

The trial court properly dismissed the Attorney General's charges, ruling that the Regents did not violate the law, as charged, because they did not conduct a " 'meeting' as defined by NRS 241.015 [the Open Meeting Law]." The trial court further ruled that communications among various Regents "involved expression of personal opinion, regarding personal conflict between various Regents" and did not, objectionably, relate to any public matters over which the Board of Regents had jurisdiction. The trial court's dismissal of the Attorney General's complaint is legally sound and should have been quickly and unhesitatingly affirmed by this court.

Rather than affirm the trial court, as it should have, this court sides with the Attorney General and cancels out the trial court's clearly-correct rulings, wrongly holding that the defendant Regents "violated the Open Meeting Law," when, in fact and law, the Regents did nothing that even comes close to being a violation of the law. Not since this court ruled that there are 370 days in a year have we experienced judicial law-making that has such an appearance of blatant political influence.[1] In this dissenting opinion I will discuss why the trial court's dismissal of the Attorney General's charges against the Regents should not have been tampered with and will suggest an explanation as to why the case might have been decided in the way that it was.

The Attorney General's charges against the Regents arose entirely out of a memorandum sent out by Regent Eardley to his

---

[1] I refer, of course, to the case of SNEA v. Lau, 110 Nev. 715, 877 P.2d 531 (1994), in which this court, by vote of a majority which includes JUSTICES YOUNG and ROSE, created the 370-day year. Absent this court's establishment of a 370-day "political year," the present governor would not have been allowed to run for a third term. To overcome the constitutional impediment to a governor's running for a third term, this court found it necessary to rule that in Nevada there were 370 days in a "political year." The court-created "political year" is different from "the ordinary and well-understood meaning of 365 day[s]" and "run[s] from and to a floating day within a month." *Id.* at 717, 718, 877 P.2d at 533. A "political" year (by adding five "floating" days), may have 370 days.

In order for the court to rule today that personal, unconnected, two-person telephone calls constituted an "official" meeting of the Board of Regents "as a public body," it had to make a leap comparable to its innovative creation of floating days and political years. It might be argued that we have here *floating* quorums (quorums comprised of five unconnected telephone calls by individual Regents to the chairman) and *political* meetings (floating quorums that do not meet with the approval of the Attorney General). I note, however, that the court does not employ either term, floating quorums or political meetings, to shore up the present opinion.

fellow Regents (other than Regent Price). Regent Eardley sent out the memorandum in question; the other "guilty" Regents did nothing more than receive it and then say "no" to the proposals put forth in the memorandum.

The stated purpose of the Eardley memorandum was to enlist "individual members" of the Board to respond to public statements being made by Regent Price and to express "their concern and opinion" about remarks that Regent Eardley saw as being slanderous, "unsubstantiated, incorrect and potentially damaging." With his memorandum, Regent Eardley sent out a proposed "draft media advisory" which stated his vision of a response that should be made by the individual Regents to what was perceived as being slanderous public statements being made by Regent Price.

Regent Eardley suggested to his colleagues that "some response is needed" (to the Price slanders) and sought each Regent's "support and endorsement" of his proposed draft media advisory. Regent Eardley made it very clear that he was only making suggestions in "draft" form and told each Regent that if she or he were "not comfortable with this course of action, please let me know at your earliest convenience," emphasizing that his "draft" would "not be released" under the name of any Regent until individual "approval has been given." As matters turned out, not one Regent approved of the draft in the form proposed by Regent Eardley.

It is not possible to conjure an official meeting of the University of Nevada Board of Regents out of the described series of individual and isolated negative responses to Regent Eardley's proposed media advisory. As pointed out by the trial court, there were "no conference calls, no physical meetings, [and] the Regents never reached a consensus about the proposed media advisory. Ultimately no action was taken." At most, said the trial court, the Regents who received Regent Eardley's memorandum were merely "exercising their First Amendment right to publicly deny Regent Price's allegations."

I suppose that it might be possible, in a situation entirely different from the one we have here, for members of a public board to subvert the open meeting law by secretly polling the membership and, thereby, vote secretly on an official decision to be made by the board; but there is nothing like this even remotely involved here. Here, the "guilty" Regents did nothing more than ignore the Eardley memorandum or decline to act in their individual capacities in the manner sought by Regent Eardley's draft proposal. It should be clear to all that the defendant Regents did not participate in any way in an official meeting of the Board and that, therefore, none of the Regents (as declared in the majority

opinion) "violate[d] the open meeting law." For those who do not readily grasp my point, I have elaborated upon it in the margin.[2]

There is a troubling aspect of this case which, although not raised by the Regents, should not pass unnoticed. JUSTICE ROSE is the "swing vote" in this case. JUSTICE ROSE has recently authored a dissenting opinion in which he expressed his concern

---

[2]To be liable for violations of the Open Meeting Law, the Regents here must not only have participated in a "meeting," the meeting must have been an *official* meeting, that is to say a meeting in which "a quorum is present to deliberate toward a decision or to take action *on any matter over which the public body has supervision, control, jurisdiction or advisory power*." NRS 241.015(2) (my emphasis). Although it is quite clear that the various members of the Board did not conduct or attend a meeting of any kind, it is beyond dispute that they did not meet in order to "deliberate" or decide any matter over which the Board had "supervision, control, jurisdiction or advisory power." No official decision or action *by the Board* was ever mentioned or suggested in the Eardley draft, and the individual Regents who received the draft were certainly free to ignore the memorandum or disagree with it without suspecting that she or he would become subject to prosecution by the Attorney General. The trial court, of course, understood this rather basic aspect of the case when it summarily dismissed the Attorney General's complaint.

The mischief of today's ruling can be clearly seen if we were to apply this ruling (namely, that a negative, individual response to another board member's proposal to respond to slanders by another board member can constitute an illegal, official meeting of that board) to any one of the public boards that have three members. Two members of these boards make a quorum; thus, under today's ruling virtually any communication between two members of such a board would result in a public meeting that required notice and the other formalities of the open meeting law. For example, if one member of a three-member board were to telephone another member and say, "Do you want to help me answer the slanderous statements that our fellow board member is making against us?," the contacted member could not say "yes" or "no" without becoming subject to prosecution by the Attorney General. (As put in the majority opinion, when "a quorum [two] of the Board chose to take a position . . . yea or nay, via a non-public vote," those two members become law violators.)

I close this note in the assumption that no one takes seriously the Attorney General's contention that the various Regents' use of University fax and telephone equipment turns these isolated communications into an official meeting of the Board of Regents. Those Board members who declined to give approval to the Eardley draft were entitled to use University staff, faxes and telephones to address, individually, a problem that related not only to "unsubstantiated accusations of wrongdoing" against individual members of the Board but also, necessarily, related to "the integrity of the Board and its policy making role for Nevada's higher education system." Under the circumstances of this case, the chairman had every right to "utilize University resources"; however, even if we were to think otherwise, the mere use of University resources by members of the Board of Regents does not a public meeting make, and, quite frankly, the argument that it does is of no significance.

about "tainted votes" in cases in which decision-makers have conflicts of interest. In O'Brien v. State, 114 Nev. 71, 952 P.2d 952 (1998), JUSTICE ROSE condemned two decision-makers, who, he claimed, had "serious conflicts of interest when they voted for [the successful party]." *Id.* at 78, 952 P.2d at 957. JUSTICE ROSE went on to say in the *O'Brien* case that "[w]ithout [these] tainted votes, the result would have been in [the losing party's] favor." *Id.*. Taking JUSTICE ROSE at his word, I would suggest that the justice may have a serious conflict of interest in the present case and that, arguably, without his "tainted" vote it is likely that the Regents would not have been declared to be law breakers.

JUSTICE ROSE complained in the *O'Brien* case that one of the decision-makers had, in the past, accepted a campaign contribution of $10,000.00[3] from one of the parties to the dispute. JUSTICES ROSE expresses his belief that the contribution was so "disproportionate" as to create "an appearance of impropriety" that was "fundamentally unfair" to the parties. *Id.* at 79, 952 P.2d 957 (ROSE, J., and YOUNG, J., dissenting). The justice claims that the result reached by the decision-maker (the Board of Bar Governors) should be invalidated and a new vote taken in which "Board members with [such] conflicts of interest not participate in it."

The ROSE doctrine of "fairness," "impropriety" and "obvious conflict of interest," which he adopts in the *O'Brien* dissent, can be summarized in this way:

1. When a "contribution is very large or greatly disproportionate . . ., then an appearance of impropriety should be recognized."
2. It is an "obvious" and "serious conflict of interest" for a recipient of such a contribution to cast a "tainted vote" for the person from whom he or she received the contribution.
3. Such conflict of interest creates "fundamental unfairness" in the decision-making process so as to require invalidation of the "tainted votes" and a new vote in which those "with conflicts of interest not participate."

In *O'Brien*, JUSTICE ROSE "insist[s] that a judge be fair and

---

[3]Although it is of no real moment, I would note that the concurring opinion makes it clear that the "contribution" in question is, in fact, no more than $10,000.00. It may be true, as claimed by the concurring justice, that the donor's husband made a contribution and that a man named Waters made contributions; but the fact remains that Ms. FitzSimmons' $10,000.00 contribution in a state-wide campaign does not appear to be "disproportionate" as claimed by JUSTICE ROSE, especially when it is contrasted to what some may see as a "contribution" to JUSTICE ROSE made by the Attorney General.

impartial and not participate in a case where doing so would present the appearance of impropriety and thus a conflict of interest." In the present case, I merely want to hold JUSTICE ROSE to his own standard. The apparent conflict of interest in this case arises much in the way that JUSTICE ROSE claims it arose in *O'Brien,* namely, by the receipt of a career-saving "contribution" from the Attorney General, who is an interested *party* in the present case. I do not see how it can be denied that JUSTICE ROSE is greatly indebted to the Attorney General, much more indebted than would be the case if, say, the Attorney General had contributed $10,000.00 to his political campaign. I will leave it to the reader to decide whether the following facts give rise to a "disproportionate contribution" by the Attorney General to JUSTICE ROSE.

In 1993, formal criminal charges, charging two "crimes against public justice" were sworn out against JUSTICE ROSE by Detective David F. Kallas of the Las Vegas Metropolitan Police Department. The charging affidavit requested that "a Warrant of Arrest/Summons be issued for suspect, Robert E. Rose, on charges of obstruction of criminal investigation, violation of NRS 199.520 and violation of NRS 199.540." The Attorney General responded to the formal charges in writing declaring that NRS 228.175 "establishes criminal jurisdiction in the office of the Attorney General over offenses committed in the course and scope of a state official's employment or arising out of circumstances related to that employment." Although the Attorney General expressed some doubt as to whether JUSTICE ROSE was actually "acting in his capacity as a state official" at the time of the alleged criminal conduct, the Attorney General, nonetheless, decided to "review[] the entire case file." The Attorney General decided not to prosecute; the requested warrant of arrest/ summons was never issued, and the prosecution ended at that point. As a result of Attorney General Del Papa's decision, JUSTICE ROSE was never prosecuted.[4]

---

[4]I do not suggest that the Attorney General's decision not to prosecute the charges against JUSTICE ROSE was made in bad faith, nor do I suggest that JUSTICE ROSE was guilty of any criminal conduct. All I do say is that, given the outcome of the Attorney General's decision, it may present an appearance of impropriety for JUSTICE ROSE to remain in a case in which the Attorney General is a *party.* I have no objections to JUSTICE ROSE's sitting in cases in which the Attorney General is counsel for the State, as she was, for example, in the *Hogan* case referred to in JUSTICE ROSE's concurring opinion. I have not, as suggested by JUSTICE ROSE, "forgotten" the *Hogan* case. My dissent in the present case is, as I have made clear in the text, based on the Attorney General's being an interested party in this appeal as distinguished from her merely being one of the attorneys for a party, as she was in *Hogan.*

Today's ruling is subject to being condemned as a political or pay-back decision involving a disqualifying "appearance of impropriety" for JUSTICE ROSE to remain in this case. Whatever might be behind the court's ruling in favor of the Attorney General and against ten of eleven members of the Board of Regents, such a ruling is subject to criticism based on at least an appearance of "impropriety" as defined by JUSTICE ROSE himself in *O'Brien*.

It is a matter of deep concern to me that not only has the court declared that ten public officials have "violated the open meeting law," it has set a precedent that threatens to terrorize public board members in the future in a way that will chill legitimate private communications among members of public boards.

I would offer the respectful suggestion that if JUSTICE ROSE refuses to disqualify himself from this case, it falls upon the Regents to attempt, on rehearing, to get him out of this case. They should do so not merely to protect their own names and to void this court's declaration that they are law violators, but to protect other public board members from the kinds of indignities and injustice that they have suffered. It is certainly arguable that a totally impartial tribunal would probably affirm the judgment of the trial court and dismiss the Attorney General's complaint.