13 P.3d 47 (2000)
Charles Jay GEPFORD, Appellant,
v.
Rebecca Doris GEPFORD, Respondent.
No. 34449.
Supreme Court of Nevada.
November 30, 2000.
Kyle B. Swanson, Winnemucca, for Appellant.
Jack T. Bullock II, Winnemucca, for Respondent.
BEFORE THE COURT EN BANC.

OPINION
YOUNG, J.
Appellant Charles Jay Gepford ("Charles") and respondent Rebecca Doris Gepford ("Rebecca") divorced after five years of marriage and after having two children. On October 11, 1991, Charles and Rebecca entered into a divorce decree. Under the divorce decree, *48 Charles and Rebecca shared joint legal custody of the children while Charles received primary physical custody of the children.
On October 31, 1998, Charles and Rebecca were both laid off from work at Newmont Gold. Charles quickly secured a new job at the Snake River Corrections Facility in Oregon. Charles also found a new residence in Idaho, which is just across the state line from his new job. After obtaining new employment in Oregon, Charles and Rebecca met to discuss Charles' moving to Idaho with the children. At that time, Charles was not aware that he needed Rebecca's written consent to relocate to Idaho with the children, because the need for written consent was not in the original divorce decree.
Although no written agreement was completed, Rebecca did verbally consent to Charles' moving to Idaho with the children. Charles and Rebecca also discussed a new visitation schedule and lowering Rebecca's child support payments. Charles and Rebecca both testified that they had laid the groundwork for an agreement concerning visitation and child support, but still needed to discuss details of the agreement. Accordingly, on November 14, 1998, Charles, the children, and Charles' long-time girlfriend, Tanya, moved to Idaho.[1]
After Charles and the children moved, Rebecca and Charles attempted to finalize a mutual agreement regarding visitation and lowering Rebecca's child support payments. Unfortunately, communication between Charles and Rebecca broke down, and they were unable to reach a final agreement.
During the second weekend in February 1999, Tanya and one of the children were in Oregon attending a wedding. Charles remained at home with the other child, who was nearly recovered from pneumonia. On February 15, 1999, Charles helped his pastor lay sheetrock for approximately six hours. As Charles worked six blocks away, the recovering child stayed at home. During the previous evening, Charles spoke with the child about going with him to lay sheetrock. The child stated that he wanted to stay home, and Charles agreed. Charles showed the child how to call Charles' pager if the child needed to contact Charles, and they practiced calling the pager. In fact, while Charles was away, the child did successfully call Charles on the pager, and Charles immediately went home. Additionally, both children have attention deficit disorder and are hyperactive, which requires them to take Ritalin three times a day. Charles was not worried about the child missing a pill because, in Charles' opinion, the child was almost ten years old, mature, and diligent about taking his pills.
While Charles was away, Rebecca called Charles' house and learned that the child was home alone. Rebecca described the child as being excited and upset. Rebecca then called the police who conducted a welfare check. The officer arrived and spoke with the child. The officer reported that the child was simply watching television and doing a project on the floor. The officer's report stated that the child said he felt fine and that he was not scared being home alone. The officer asked if the child wanted him to call anyone, and the child said that he did not need anyone called because he had Charles' pager number. The officer's report also stated that the child had food, blankets, and the house was warm. Consequently, the officer had the dispatcher inform Rebecca that the child was fine.
Subsequently, on March 22, 1999, Rebecca filed a motion in district court seeking primary physical custody of the children. As grounds for modifying custody, Rebecca asserted that, pursuant to NRS 125C.200, Charles failed to obtain her written consent before moving to Idaho, that Charles left the one child at home alone, and that Charles had denied visitation to Rebecca.[2]
*49 On May 28, 1999, the district court granted Rebecca's motion and awarded her primary physical custody of the children. Specifically, the district court concluded, in relevant part:
2. That the Plaintiff has satisfied the first prong of Murphy v. Murphy, 84 Nev. 710, 447 P.2d 664 (1968), by establishing that there has been a material change of circumstances of both parties hereto as determined in this Court's findings;
3. That the Plaintiff has satisfied the second prong of Murphy v. Murphy, supra, by establishing that the welfare of the children will be substantially enhanced by changing custody from the Defendant to the Plaintiff;
4. That the fact of Defendant leaving the nine (9) year old child home alone when he was recovering from pneumonia and taking Ritalin for his Attention Deficit Disorder with Hyperactivity was not good and showed poor judgment on Defendant's part;
5. That the fact that Defendant relocated the residence of the children without the written consent of the Plaintiff or this Court's order, compels this Court to consider this as a factor in changing custody as authorized by NRS 125A.350 [recodified as NRS 125C.200];
6. That the Plaintiff will be the better parent to allow the frequent and continuing association of the children with the Defendant as authorized by NRS 125.480;
7. That the best interests of the children will be served by a change of custody from the Defendant to the Plaintiff.
On appeal, Charles argues that the district court abused its discretion by granting the motion to change custody of the children to Rebecca. Specifically, Charles contends that the district court incorrectly concluded that Rebecca satisfied the second prong of Murphy v. Murphy, 84 Nev. 710, 447 P.2d 664 (1968). We agree.
"Once primary custody has been established, a court can consider changing custody only if `(1) the circumstances of the parents have been materially altered; and (2) the child's welfare would be substantially enhanced by the change."' McMonigle v. McMonigle, 110 Nev. 1407, 1408, 887 P.2d 742, 743 (1994) (emphasis added) (quoting Murphy, 84 Nev. at 711, 447 P.2d at 665). A district court's determination of custody will not be disturbed unless there has been a clear abuse of discretion. See Primm v. Lopes, 109 Nev. 502, 504, 853 P.2d 103, 104 (1993). However, this court must also be satisfied that the district court's determination was made for appropriate reasons. See Sims v. Sims, 109 Nev. 1146, 1148, 865 P.2d 328, 330 (1993). Moreover, this court will not set aside the district court's factual determinations if they are supported by substantial evidence. See Primm, 109 Nev. at 506, 853 P.2d at 105.
In the present case, we conclude that substantial evidence does not support the district court's conclusion that the children's welfare would be substantially enhanced by a change of custody. In criticizing Charles' conduct, the district court's order cites only to Charles leaving the child home alone on a single occasion. The record is clear that Charles believed the child was mature enough to stay home alone for a few hours and was diligent about taking his medication on his own. Indeed, the child suffered no harm from the incident, and after conducting a welfare check, the police found him to be fine and in no need of assistance.
In Sims, we concluded that "[i]t may not be ideal to leave a ten-year-old child with the flu at home alone for a few hours (albeit with telephone access) but it hardly smacks of a reason to lose custody." Sims, 109 Nev. at 1149, 865 P.2d at 330. Accordingly, although it is probably not advisable to leave a child home alone who is nearly recovered from an illness, we conclude that this lone incident is an insufficient basis on which to premise a change of custody under the second prong of Murphy.[3]
*50 A further indication of the arbitrariness of the decision to give primary physical custody to Rebecca is the fact that Charles appears to be an active and involved father. Until the district court's decision, Charles was the primary physical custodian of the children since he and Rebecca divorced in 1991. Moreover, Charles' new job is now more conducive to family life in that he now works only fourteen miles from home, works a normal nine hour day, and is no longer on call. Further, a teacher, a school counselor, and the principal from the children's former school in Winnemucca all testified that Charles was responsive and open to their suggestions regarding the children's special educational needs. Indeed, the district court even noted in an earlier custody order that "the father has been the more stable, primary custodian of these boys." While we do not suggest that Rebecca is not an equally caring and able parent, we simply conclude that the record belies the district court's conclusion that Charles' parenting is deficient and that the children's welfare would be substantially enhanced by living with Rebecca, which is the appropriate standard under the second prong of Murphy.
Additionally, we also note that upon a careful review of the entire record on appeal, it appears that the district court gave undue weight in its oral and written decision to Charles' non-compliance with NRS 125C.200.[4] Although the district court properly considered Charles' non-compliance with NRS 125C.200 as a factor in its decision, this non-compliance is not determinative of the issues under Murphy. This is especially true in light of the fact that Charles acted in good faith in initially securing Rebecca's verbal consent to his moving with the children.
Indeed, Rebecca testified that she gave Charles her verbal consent and that the groundwork had been laid concerning future visitation and lowering Rebecca's child support payments. In her motion for a change of custody, Rebecca further evidenced her previous consent by stating that she "no longer gives her consent to the relocation to the State of Idaho." Unfortunately, Charles and Rebecca never reproduced their agreement in writing. Nevertheless, by focusing more on Charles' non-compliance with NRS 125C.200, the district court appears to have been more concerned with punishing Charles for his conduct instead of sufficiently considering the best interests of the children and whether Rebecca satisfied the second prong of Murphy. See Sims, 109 Nev. at 1149, 865 P.2d at 330 ("This court has made it clear that a court may not use changes of custody as a sword to punish parental misconduct; disobedience of court orders is punishable in other ways.").[5]
For the foregoing reasons, we conclude that the district court abused its discretion in ruling that Rebecca satisfied the second prong of Murphy. Accordingly, we reverse the district court's order and remand for further proceedings consistent with this opinion, *51 including a new custody hearing and specific findings regarding whether giving primary physical custody to Rebecca would substantially enhance the children's welfare as required under the second prong of Murphy. See Murphy v. Murphy, 84 Nev. 710, 711, 447 P.2d 664, 665 (1968). Upon remand, we note that under NRS 125C.200 Charles is not barred from filing a petition for permission to move the children to another state in anticipation that the district court could return primary physical custody of the children to him.[6]
ROSE, C.J., LEAVITT and BECKER, JJ., concur.
SHEARING, J., with whom AGOSTI, J., and MAUPIN, J., agree, dissenting.
The majority has made a decision contrary to the very law it cites. Primm v. Lopes, 109 Nev. 502, 853 P.2d 103 (1993), provides that this court will not set aside the district court's factual determinations if they are supported by substantial evidence and will not disturb a district court's determination of custody absent a clear abuse of discretion. Id. at 506 and 503, 853 P.2d at 105 and 104. Every one of the district court's findings was supported by substantial evidence. Accordingly, I conclude that the district court did not abuse its discretion by granting the motion to change custody, and would affirm the district court order.
The district court found that the mother would be the better parent to allow frequent and continuing association of the children with the other parent. This is one of the most important factors in determining who should have custody. Our legislature has specifically stated that the public policy of this state is that a major factor in determining custody of children is which parent is more likely to allow the child to have frequent associations and a continuing relationship with the noncustodial parent. See NRS 125.480(3)(a). There was substantial evidence to support the district court's finding. There was testimony that the father had prevented not only the mother's visitation with her children, but also her telephone contact with them.
The majority states that the district court gave undue weight to the father's removing the children from the state without obtaining either the mother's written consent or a court determination. It is true that the mother initially gave verbal consent to the move; however, it was on the understanding that they would fashion a liberal visitation schedule for the mother. While the children were in Nevada, the mother had almost as much physical contact with them as the father did. There was evidence that after the father took the children out of state, the father not only would not agree to a liberal visitation schedule, but also would not even agree to minimal contact. Recognizing that failure is not punishing the father for taking the children out of state, but rather is furthering the policy that frequent contacts with both parents is in the best interest of the child by giving primary physical custody to the parent most likely to foster relations with the other parent.
The majority states that the arbitrariness of the district court's decision is demonstrated by the fact that the father appeared to be active and involved while he was in Nevada. The majority ignores the fact that the mother was also an active and involved parent when the children were in Nevada. She also sought to be active and involved while the children were in Idaho, but was frustrated by the father. Furthermore, despite the fact that the mother still retained joint legal custody of the children, the evidence showed that the father was in the process of having the children baptized in a new church, without any consultation with the mother. The majority implies that any evidence supporting a conclusion that is not included in the district court's findings of fact cannot be considered. That is not the law. The district court found that the best interests of the children would be substantially enhanced by changing primary physical custody from *52 the father to the mother. It is not necessary for the judge to recite in the order each piece of evidence going into that decision, as long as there is substantial evidence in the record to support the conclusion.
As the evidence described above shows, the majority mischaracterizes the evidence before the district court by stating that the only criticism of the father's conduct was leaving one of the children home alone on a single occasion. Even if that were true, the child who was left alone had asthma, a heart murmur, attention deficit hyperactivity disorder and still was suffering from pneumonia. This impulsive child, who had no concept of time, was left to medicate himself. Leaving such a child home alone in such circumstances is not so benign, even if no physical harm resulted. However, this lack of judgment by the father was clearly only one factor considered by the judge, and not the most important one.
There is no basis whatsoever for this court to reverse the judgment of the district court when the issue is so fact specific. The district court heard the evidence, could weigh the credibility of the parties and made a determination as the best interests of the children. This court is in no position to make such a judgment and it is not this court's function to do so. There was substantial evidence to support the district court's decision. The district court did not abuse its discretion. Accordingly, I dissent.
MAUPIN and AGOSTI, JJ., concur.
NOTES
[1] After moving to Idaho, Charles married Tanya, who is a homemaker and helps care for the children. Rebecca has also remarried and is currently married to Jody Snare who works for Newmont Gold in Indonesia.
[2] In her motion, Rebecca also asserted that Charles denied her telephone contact with her children and that the children were infected with head lice while in Charles' care. However, we do not address these allegations on appeal because the district court did not refer to them in its written order granting Rebecca's motion.
[3] Although the dissent appears to suggest that the majority is improperly reevaluating the evidence in this case, this court has explicitly held, as noted above, that it is our proper function to review the district court's factual determinations and ensure that those determinations are supported by substantial evidence. See Primm, 109 Nev. at 506, 853 P.2d at 105. If they are not, the district court's decision is unsustainable as being an abuse of discretion. See id. at 504, 853 P.2d at 104. Accordingly, our review of this case necessarily involves a reassessment of the evidence presented below regardless of the dissent's suggestion otherwise.
[4] NRS 125C.200 provides:

If custody has been established and the custodial parent intends to move his residence to a place outside of this state and to take the child with him, he must, as soon as possible and before the planned move, attempt to obtain the written consent of the noncustodial parent to move the child from this state. If the noncustodial parent refuses to give that consent, the custodial parent shall, before he leaves this state with the child, petition the court for permission to move the child. The failure of a parent to comply with the provisions of this section may be considered as a factor if a change of custody is requested by the noncustodial parent.
[5] The dissent also states that Charles interfered with Rebecca's visitation. However, this is belied by a careful review of the record. In fact, after Charles and the children moved to Idaho, the record shows that Rebecca spent the Thanksgiving holiday with the children in Idaho. Because the Christmas holiday was Charles', Rebecca traveled to Indonesia to be with her husband from December 4, 1998, to January 15, 1999. After her return, Rebecca spent three of the next four weekends with the children. She then returned to Indonesia from February 19, 1999, through March 1, 1999. When she returned from Indonesia, Rebecca spent two of the next three weekends with the children before filing her motion for a change of custody on March 22, 1999.
[6] Charles also argues that the district court erred in concluding that it could not approve Charles' relocation because Charles did not file a petition under NRS 125C.200 for permission to move before the hearing. In light of our decision to remand the case to the district court, we find it unnecessary to consider this issue.