75 P.3d 388 (2003)
Jeffrey A. BARRY, Appellant,
v.
Robyn LINDNER, Respondent.
No. 38177.
Supreme Court of Nevada.
August 29, 2003.
*389 Jeffrey Friedman, Reno, for Appellant.
Skinner, Watson & Rounds and Gregory S. Skinner, Reno, for Respondent.
Before ROSE, MAUPIN and GIBBONS, JJ.

OPINION
PER CURIAM:
As the primary issues of this appeal, we consider whether telephonic testimony is permitted at trial and whether the district court correctly imputed income to Jeffrey Barry. We hold that telephonic testimony is only permissible under special circumstances and conclude that the district court did not abuse its discretion when it imputed income to Barry.

FACTS
On May 16, 1993, Barry and Robyn Lindner were married. The following year, they had a son.
In 1977, Barry created his own company, Savings and Development Corporation, which developed insurance programs for credit cards. Between 1977 and 1988, Savings and Development was very successful, as it earned over a million dollars. In the early 1990s, Barry liquidated and transferred all of Savings and Development's assets to Gresham Group, Inc. Gresham Group agreed to compensate Savings and Development on the operation of the business.
Barry is the sole owner of Destra Risk Management Limited, another corporation he created before his marriage. In early 1993, Savings and Development assigned its compensation from Gresham Group to Destra. Between 1993 and January 2000, Gresham Group paid Destra $716,955.32. During *390 the marriage, Barry used Destra's income to pay the household and community expenses, approximately $1,500 a month.
When Barry and Lindner married, Lindner was working part-time as a personal trainer. Lindner quit working after she became pregnant, and after their son was born she was his primary caregiver. In 1997, Lindner returned to working part-time as a personal trainer.
On March 8, 2000, Lindner filed a complaint for divorce. After Barry accepted service of the divorce complaint, he went to Europe. Barry claims that before he went to Europe he met Lindner and her attorney, and following the meeting he was under the impression that Lindner would not file any documents while he was in Europe.
On March 20, 2000, Lindner filed a motion requesting temporary child custody, child support, and spousal support. Lindner also requested exclusive possession of the marital residence, attorney and accountant fees, and costs. Before Lindner filed her motion, Barry signed an Acceptance of Service, indicating that he received a copy of Lindner's motion. On April 5, 2000, Lindner requested submission of her motion and served Barry with a copy of the request. On April 12, 2000, Lindner's attorney filed an affidavit of service, stating that on March 20, 2000, Barry was faxed a letter advising him that he had ten days to respond to Lindner's motion. Barry did not file a response to Lindner's motion.
On April 19, 2000, the district court entered a default order granting Lindner's motion. The district court granted Lindner temporary legal and physical custody of the couple's son, and ordered that Barry would have reasonable visitation rights to be determined at mediation. The district court ordered Barry to pay $500 a month in temporary child support, to pay $4,000 a month in temporary spousal support, and to provide medical insurance for Lindner and their son. The district court also ordered Barry to produce all his financial records, and to pay Lindner $7,000 for preliminary attorney fees and $5,000 for interim accountant fees.
On May 11, 2000, Barry filed, among other things, a motion to set aside the default order. The district court denied the motion. Thereafter, Barry filed a motion for visitation, claiming that Lindner had denied him visitation with their son from the time the parties separated. In denying Barry's motion, the district court noted that Barry was not granted temporary visitation because Barry had failed to file an opposition to Lindner's motion requesting temporary child custody and allowances or to request visitation. The district court then ordered that Barry be awarded reasonable visitation rights to be determined through mediation with the Washoe County Family Mediation Program.
Before trial, the district court appointed a special master to review Barry's financial status because Lindner claimed that Barry was lying to the district court regarding his finances. In his report, the special master noted that Barry's business transactions and claimed present financial status were unusual, but stated that there was no evidence of fraudulent concealment or misrepresentation. Because of Barry's lack of financial records, the special master noted that Barry's financial status was "full of flags."
A two-day bench trial commenced on March 29, 2001. At trial, Barry claimed that he was destitute. He testified that at various times in 2000, he worked as a consultant, receiving a total of $16,000 for consulting. Barry claimed that he had no other income, and that his income from Destra was his separate property.
Barry claimed that he borrowed $375,000 from Glovill Enterprises, which is incorporated in Panama and located in Switzerland. Barry was unable to produce any documentation evidencing Glovill's existence. He explained that Carlos "Tony" Bauman, his friend and business partner, was his only contact with Glovill.
Barry produced three promissory notes that he signed for the Glovill debt: $150,000 on January 20, 1995; $125,000 on April 3, 1996; and $100,000 on January 27, 1997. Barry explained that the loans were made based on his personal reputation, as he was not required to provide any collateral for the *391 loans. Barry signed each of the promissory notes, which identified Glovill as the creditor and set forth the terms of repayment. On January 20, 2000, the repayment terms for the three promissory notes were restructured. The restructuring document stated that Lindner was jointly liable for the debt, but only Barry, not Glovill or Lindner, signed the document. Barry testified that he paid Glovill $16,000 in accordance with the terms of the restructuring document, but Barry could not produce any documentation that the payment had been made. Barry claimed that he assigned Destra's income from Gresham Group to Glovill, and had the payments sent to Bauman's address. Barry testified that he owed Glovill $583,504, including interest.
Barry explained that Glovill had the moneyBrazilian currencydelivered to a company in Brazil, and that Bauman would call and confirm the delivery; thus, no receipts or documents were generated. Barry testified that Lindner was aware that he was borrowing money in Europe to be used for developing a business plan in Brazil. Barry maintained that Lindner knew that the community had borrowed the money, but he was not sure whether she knew the amount or that Glovill was the lender.
Thus, Barry claimed that the Glovill debt was a community debt. Additionally, Barry claimed that his credit card debt and the $18,000 he borrowed from his mother for legal expenses were community debts.
On the other hand, Lindner maintained that she did not know about the Glovill debt. Lindner explained that in 1996, she and Barry began having marital problems and she saw an attorney. The attorney prepared a marital settlement agreement outlining each party's assets and debts, but the Glovill debt was not included, as she was not aware of it. After Lindner showed Barry the marital settlement agreement, they stopped the divorce proceedings and attended marriage counseling. Barry claimed that he did not see the marital settlement agreement until trial.
Lindner testified that Barry paid all the community expenses during the marriage. She maintained that she did not know much about Barry's work, including his income. But, in July 1999, she discovered several of Barry's credit card bills, showing that he stayed in expensive hotels and had expensive dinners. Because she did not know Barry's income and because Barry claimed that he had no income but still had various expenditures, Lindner requested the district court to impute income to Barry. She claimed that Barry spent approximately $40,000-50,000 annually on his personal expenditures and spent an equivalent amount on the community expenses, totaling $100,000.
Regarding their son, Lindner and Barry agreed that Barry should have visitation rights. Because Barry had been absent from their son's life for a year, Lindner opined that Barry should have supervised visitation until their son felt comfortable with Barry. Barry, however, disagreed with supervised visitation, but agreed that his visitation rights should gradually increase in time.
After trial, the district court entered its decision. The district court first denied Barry's request for spousal support, finding that although Barry was not currently employed notwithstanding his income from consultingBarry had earned a comfortable living in the past. However, the district court granted Lindner's claim for spousal support, finding that Lindner quit working to become their son's primary caregiver. Although Barry claimed that he had no income, the district court imputed an annual income of $35,000 to Barry based on his previous income and continued expenditures. Thus, the district court awarded Lindner $350 a month in spousal support for thirty months.
The district court next addressed each party's request for attorney fees. The district court found that neither party presented any evidence that they could not present their case "without an award of resources to do so." The district court also found that there was no evidence that either party was guilty of misconduct during the divorce proceedings. The district court further found that Barry's loan from his mother for legal expenses was not a community debt.
The district court next addressed the issue of the Glovill debt. The district court first noted that Barry failed to introduce any documentary *392 evidence that he received the Glovill money or that he made payments on the three promissory notes, and Barry failed to produce any evidence that Glovill existed. The district court also noted that Lindner denied any knowledge of the Glovill debt, and that Barry did not mention the debt on his first sworn financial statement. Therefore, the district court found that Barry failed to establish that the Glovill debt was a valid community debt.
Regarding the parties' property, the district court stated that there was no evidence of personal property assets, and that the majority of the assets were each party's separate property. The district court denied Barry's claim that his outstanding credit card debt was a community debt.
The parties stipulated to joint legal custody of their son and that Lindner would have primary physical custody. The district court set forth a progressive visitation schedule for Barry, and ordered Barry to pay $500 a month for child support.

DISCUSSION

Telephonic testimony
Barry contends that the district court erred when it refused to allow Carlos "Tony" Bauman to testify at trial by telephone.[1] The decision whether to permit a witness to testify is within the sound discretion of the district court, and that determination will not be disturbed on appeal absent an abuse of discretion.[2] The district court has the authority to control the interrogation of witnesses at trial under NRS 50.115, which provides in pertinent part:
1. The judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence:
(a) To make the interrogation and presentation effective for the ascertainment of the truth;
(b) To avoid needless consumption of time; and
(c) To protect witnesses from undue harassment or embarrassment.
Before trial, Barry requested that Bauman testify by telephone because Bauman lived in Switzerland and was beyond the district court's jurisdiction and beyond subpoena power. Barry argued that telephonic testimony was not unusual as many depositions are taken by telephone, and the law only requires that testimony be given in open court, not in person. Barry stated that the parties could fax Bauman the documents that he would testify about.
Lindner, who had no opportunity to depose Bauman before trial, argued that she would be prejudiced if the district court allowed Bauman to testify by telephone because she would not be able to confront him, as she would not be able to cross-examine him with documents and observe his demeanor. The district court agreed, finding that the Confrontation Clause issue weighed against permitting Bauman to testify by telephone. The district court noted that there was no statutory authority for telephonic testimony at trial, and expressed concern that it would lack contempt power over Bauman if he testified by telephone. Therefore, the district court ruled that Bauman would not be permitted to testify by telephone.
NRCP 43(a) provides: "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules or by statute." No statute or rule provides for telephonic testimony at trial.
Other jurisdictions have addressed the issue of telephonic testimony. Some jurisdictions have issued guidelines and procedures governing telephonic testimony,[3] while *393 others have only permitted telephonic testimony under special circumstances, i.e., exigency or consent and knowledge of the witness' identity and credentials.[4] However, in the absence of such special circumstances, generally courts have not permitted telephonic testimony.[5] We agree with the jurisdictions that use the special circumstances standard. Thus, absent a showing of special circumstances, telephonic testimony is not permissible at trial.
Using this standard, we conclude that the district court did not abuse its discretion in not allowing Bauman to testify by telephone. Barry failed to establish any exigent circumstances, and Bauman was not an expert witness who had submitted a report.

Default order
Barry filed a motion to set aside the default order, which granted Lindner temporary child custody and allowances, under NRCP 60(b)(1)mistake, inadvertence, surprise, or excusable neglect. Barry argued that after meeting with Lindner and her attorney, he was under the impression that Lindner's attorney had given him an extension within which to respond to Lindner's motion. The district court denied Barry's motion, finding that Barry's failure to respond was not the result of mistake, inadvertence, surprise or excusable neglect because Barry was personally served with Lindner's motion, was faxed a letter explaining the length of time for him to respond, and was mailed a copy of Lindner's request for submission of the motion.
On appeal, Barry contends that the district court erroneously denied his motion to set aside the default order because he had no intent to delay the proceedings, he was unaware of the procedural requirements, he believed he had an open extension of time to file an opposition, he did not have counsel when the default order was entered, he acted in good faith, and he had a meritorious defense to Lindner's motion. This court will not disturb a district court's decision regarding an NRCP 60(b) motion absent an abuse of discretion.[6] However, the district court's discretion is a "legal discretion" that "cannot be sustained where there is no competent evidence to justify the court's action."[7]
Under NRCP 60(b), the district court may relieve a party from an order on the grounds of mistake, inadvertence, surprise or excusable neglect.[8] The district court should consider the following factors when deciding whether to set aside a default:
(1) a prompt application to remove the judgment;
(2) the absence of an intent to delay the proceedings;
(3) a lack of knowledge of procedural requirements; and

*394 (4) good faith.[9]
A party requesting a district court to set aside a default need not show a meritorious defense.[10] But, "the district court must consider the state's underlying basic policy of deciding a case on the merits whenever possible."[11]
In applying the factors to set aside a default, we conclude that the district court did not abuse its discretion when it refused to set aside the default order. Certainly, Barry timely filed his motion to set aside the default order because he filed his motion less than a month after the district court entered the default order. And there is no evidence that Barry intended to delay the proceedings. However, Barry failed to present any facts establishing mistake, inadvertence, surprise or excusable neglect. As the district court found, Barry was personally served with Lindner's motion, he received a letter thereafter informing him that he had ten days to respond, and he received a copy of Lindner's request for submission of the motion.

Substantial evidence
Barry contends that the district court made several erroneous findings, in particular, imputing income to him and finding that the Glovill debt, the loan from his mother, and the credit card debt were not community debts. This court will uphold a district court's findings of fact if they are supported by substantial evidence.[12]
The district court imputed an annual income of $35,000 to Barry based on his previous income and continued expenditures. We conclude that substantial evidence supports this finding. There was no evidence besides Barry's self-serving testimony that he was destitute. Barry received income from consulting, and he continued to spend money on various expenditures. Also, Barry's previous income was significant.
We next conclude that the district court's finding that Barry failed to establish that the Glovill debt was a valid community debt is supported by substantial evidence. Granted, Barry produced the three promissory notes and the restructuring agreement. However, only Barry's signature was on each of the documents, and none of the documents provided an address, telephone number, or any other information regarding Glovill. And, although Barry did not know Glovill's address and other information by memory, Barry failed to provide the district court with any documentation that Glovill existed. Furthermore, even though Barry testified that Lindner knew about the Glovill debt, the district court was at liberty to weigh this testimony, which it did, ruling that Lindner had no knowledge about the Glovill debt as she had testified.[13]
Finally, we conclude that substantial evidence supports the district court's finding that Barry's loan from his mother for legal expenses and credit card debt were not community debts. First, contrary to Barry's assertion, the loan was not acquired for the benefit of the community, and it was acquired after the parties separated. Next, as the district court noted, Barry failed to establish his current credit card debt.

Sanctions
This court expects all appeals to be pursued with high standards of diligence, professionalism, and competence.[14] The Nevada Rules of Appellate Procedure impose *395 affirmative obligations on appellate counsel.[15] This court may impose sanctions against appellate counsel for failing to comply with the Nevada Rules of Appellate Procedure.[16]
Our review of the briefs prepared by attorney Jeffrey Friedman reveals that appellant's opening and reply briefs are wholly deficient in that they fail to comply with the Nevada Rules of Appellate Procedure. First, the briefs have failed to comply with NRAP 28(e), which provides in part: "Every assertion in briefs regarding matters in the record shall be supported by a reference to the page of the transcript or appendix where the matter relied on is to be found." Several assertions in the opening brief are not supported by citations to the record on appeal, and the reply brief contains only one citation to the record on appeal. Although the opening brief provides some citations to the record in the statement of facts, the citations are often redundant and hard to follow. In some instances, the opening brief exaggerates the record;[17] while in other instances, the citations fail to support the asserted allegations.
Second, the opening and reply briefs fail to provide adequate supporting law. NRAP 28(a)(4) requires that arguments contain "citations to the authorities, statutes and parts of the record relied on." The opening brief lacks any supporting law in the argument section. Rather, the opening brief contains a separate section titled "Relevant Law," which is deficient because the supporting law is only a list of general propositions with little, if any, analysis. Additionally, many of the arguments in the reply brief lack any supporting law.
Finally, we note that the opening and reply briefs fail to comport with certain form requirements. NRAP 32(a) requires any brief to be typed, numbered at the bottom, and double-spaced. Here, the briefs are not double-spaced (35 lines on a 28-lined page) and the page numbers have been handwritten.
In Smith v. Emery,[18] we imposed a one thousand dollar sanction for failing to comply with NRAP 28, and in doing so, we stated: "We intend to impress upon the members of the bar our resolve to end the lackadaisical practices of the past and to enforce the Nevada Rules of Appellate Procedure." We again must impress upon the practitioners appearing before this court that we will not permit flagrant violations of the Nevada Rules of Appellate Procedure. Thus, we sanction Friedman in the amount of five hundred dollars ($500) for his violations of the Nevada Rules of Appellate Procedure. Friedman shall remit this sum within thirty days of the filing of this opinion to the Nevada Supreme Court Law Library and shall file written proof of payment with the clerk of this court within the same time frame.

CONCLUSION
We hold that telephonic testimony is not permissible except under special circumstances. Because Barry failed to show any special circumstances, we conclude that the district court did not abuse its discretion when it refused to allow Bauman to testify at trial by telephone.
We conclude that the district court did not abuse its discretion when it denied Barry's motion to set aside the default order. We also conclude that substantial evidence supports the district court's findings of fact.[19]
Accordingly, we affirm the district court's judgment.
NOTES
[1] Barry also contends that the district court erred in not allowing the special master to testify. The special master would have testified that it was his business practice to destroy business records after a business transaction was complete. We conclude that the district court did not abuse its discretion on this issue because the special master's business practices were not relevant.
[2] See Petty v. State, 116 Nev. 321, 325, 997 P.2d 800, 802 (2000); Rippo v. State, 113 Nev. 1239, 1261, 946 P.2d 1017, 1031 (1997).
[3] See, e.g., The Florida Bar: In re Rules of Summary Proc., 461 So.2d 1344, 1345 (Fla.1985) (adopting rule to allow telephonic testimony of nonparty witnesses at trial); Town of Geneva v. Tills, 129 Wis.2d 167, 384 N.W.2d 701, 705 (1986) (noting that a trial court may permit telephonic testimony if the right to a fair trial is preserved).
[4] See, e.g., Elson v. State, 633 P.2d 292, 302 (Alaska Ct.App.1981) (affirming the district court's decision allowing the state's chemist to testify at the sentencing hearing by telephone where defense counsel had a copy of the chemist's report and the chemist was testifying to that report), aff'd, 659 P.2d 1195 (Alaska 1983); Ferrante by Ferrante v. Ferrante, 127 Misc.2d 352, 485 N.Y.S.2d 960, 962 (Sup.Ct.1985) (allowing a ninety-two-year-old plaintiff to testify by telephone when she was unable to travel to New York from Florida); Matter of W.J.C., 124 Wis.2d 238, 369 N.W.2d 162, 163-64 (Ct.App.1985) (concluding that a patient's due process rights were not violated when the court-appointed psychiatrist and psychologist, each of whom had already filed a full report, testified by telephone in a civil commitment hearing).
[5] See, e.g., Rose v. State, 294 Ark. 279, 742 S.W.2d 901, 905 (1988) (excluding a police officer's telephonic testimony at a suppression hearing because it was not shown that he was unavailable); Aqua Marine Prod. v. Pathe Computer, 229 N.J.Super. 264, 551 A.2d 195, 200 (App.Div. 1988) (concluding that the trial court erroneously permitted telephonic testimony absent special circumstances).
[6] Stoecklein v. Johnson Electric, Inc., 109 Nev. 268, 271, 849 P.2d 305, 307 (1993).
[7] Id.
[8] See also In re Herrmann, 100 Nev. 1, 27, 677 P.2d 594, 610 (1984) (noting that NRCP 60(b) allows a party to file a motion to vacate orders).
[9] Yochum v. Davis, 98 Nev. 484, 486, 653 P.2d 1215, 1216 (1982) (citing Hotel Last Frontier v. Frontier Prop., 79 Nev. 150, 154, 380 P.2d 293, 295 (1963)).
[10] Epstein v. Epstein, 113 Nev. 1401, 1405, 950 P.2d 771, 773 (1997).
[11] Stoecklein, 109 Nev. at 271, 849 P.2d at 307.
[12] See Gepford v. Gepford, 116 Nev. 1033, 1036, 13 P.3d 47, 49 (2000).
[13] See Rowland v. Lepire, 99 Nev. 308, 312, 662 P.2d 1332, 1334 (1983) (noting that it is exclusively within the province of the trier of fact to weigh evidence and pass on credibility of witnesses and their testimony).
[14] Cuzdey v. State, 103 Nev. 575, 578, 747 P.2d 233, 235 (1987).
[15] See Moran v. Bonneville Square Assocs., 117 Nev. 525, 530 n. 13, 25 P.3d 898, 901 n. 13 (2001).
[16] See NRAP 28A(b); see also Smith v. Emery, 109 Nev. 737, 743, 856 P.2d 1386, 1390 (1993).
[17] For example, the opening brief states that Lindner removed Barry from their home by "threatening him with a gun and a verbal threat to `call the police on him.'" Although Lindner testified that she threatened to call the police, Lindner did not testify that she threatened Barry with a gun and there is no other evidence in the record to support that assertion.
[18] 109 Nev. at 743, 856 P.2d at 1390.
[19] Barry contends that the district court erred in awarding spousal support and visitation. We conclude that Barry's arguments lack merit.