42 A.3d 141

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. JUAN
PABLO SANTOS, DEFENDANT–RESPONDENT.

Argued January 18, 2012—Decided May 8, 2012.

Albin, J., dissented, with opinion.

————

Samuel J. Marzarella, Supervising Assistant Prosecutor, argued the cause for appellant (Marlene Lynch Ford, Ocean County Prosecutor, attorney).

Ubel G. Velez, a member of the Pennsylvania bar, argued the cause for respondent (Maritza Colon, attorney).

Michael J. Williams, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Jeffrey S. Chiesa, Attorney General, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

This is a post-conviction relief (PCR) matter. Defendant Juan Pablo Santos, a Mexican citizen, had been removed from the United States to Mexico in 2008 within weeks of sentencing following his plea to third-degree endangering the welfare of a child. Santos had been found in bed with a fourteen-year-old girl, with whom he had been living and with whom he confessed to having an ongoing sexual relationship. At some point within the year following his removal, he illegally reentered the United States, was discovered, and was returned to Mexico after the United States Department of Homeland Security reinstated its removal order. He thereafter filed a PCR petition in which he claimed ineffective assistance of counsel on the asserted basis that he was not informed that removal was a possible consequence of his guilty plea. The PCR court granted Santos an evidentiary hearing on his petition.

We initially granted leave to appeal to consider troublesome practical aspects to the way in which that evidentiary PCR hearing was to be conducted. Because Santos now resides in Mexico and is legally barred from reentering the United States, he filed a motion seeking permission to testify via telephone. Over the State's strenuous objection, the court granted the motion. The matter was stayed by this Court and, after the Appellate Division denied the State's interlocutory appeal, we granted leave to appeal. *State v. Santos*, 207 *N.J.* 226, 23 *A.*3d 933 (2011). No evidentiary proceedings have occurred yet.

Telephone testimony has received scant attention in our case law. To the extent it has been addressed, it has been viewed with some skepticism and has been approved for use in only limited circumstances, chiefly due to the obstacles it creates for the factfinder in verifying the identity and assessing the demeanor of witnesses and rendering credibility determinations. While the proper use of telephone testimony, or the more modern forms of video communication, in PCR proceedings deserves careful attention, recent developments in the law suggest that this case is not an appropriate vehicle for considering alternative means of securing live testimony from a distant essential witness. Issuance of the decision in *State v. Gaitan*, 209 *N.J.* 339, 37 *A.*3d 1089 (2012), calls into serious question the validity of the grant of an evidentiary hearing in this matter. Accordingly, we determine that the grant of an evidentiary hearing must be reversed and the matter remanded to the trial court for complete reevaluation as to whether Santos can meet the standard for entitlement to an evidentiary hearing under *Gaitan*, particularly in light of the later-produced affidavit from Santos's defense counsel and related evidence which the PCR court did not have.

I.

In June 2005, police discovered defendant Santos naked and in bed with a fourteen-year-old girl, A.A., in Santos's home in Lakewood Township. He was arrested and, after receiving *Mi-*

*randa* [1] warnings, admitted that he lived with the girl and that they had an ongoing sexual relationship. As a result, he was indicted by an Ocean County grand jury on one count of second-degree sexual assault, *N.J.S.A.* 2C:14–2(c)(4), and one count of third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4(a).

Following negotiations with Santos's counsel, Norman Smith, the State proposed a plea agreement under which Santos would plead guilty to third-degree endangering the welfare of a child in exchange for the State's agreement to drop the sexual assault charge and recommend to the sentencing court that his term of imprisonment be limited to time served. Santos would also be required to register as a sex offender and submit to the lifetime parole supervision required by Megan's Law, *N.J.S.A.* 2C:14–2(c)(4). After consulting with Smith on more than one occasion, Santos decided to accept the deal.

On March 14, 2008, Santos appeared in Superior Court to enter his guilty plea. Prior to the hearing, Santos, who speaks only Spanish, met with Smith and a court interpreter to complete the plea form and other required paperwork. In response to Question 17 on the plea form, which read: "Do you understand that if you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?," Santos circled "Yes." Santos also indicated on the form that he was satisfied with the advice he had received from Smith and had no questions concerning the plea. However, when the hearing began, Santos informed the court that he no longer wished to enter the plea and that he wanted to speak to a Spanish-speaking attorney named Carlos Ferreira. The court granted Santos leave to seek alternate counsel and rescheduled the plea hearing.

Ten days later, Santos and counsel appeared for the rescheduled plea hearing. An interpreter for Santos was also present. Noting that Santos was still represented by Smith, the court asked

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

Smith to explain what had transpired since the earlier proceeding. Smith stated that Santos had consulted with Ferreira on two occasions and that Ferreira had advised Santos that accepting the plea deal was "the only rational course." Smith further explained that Santos had hesitated at the prior proceeding because he had not fully understood the consequences of the plea, but that all of his questions had since been answered. Following Smith's explanation, the court, through the interpreter, asked Santos to verify that he understood the terms of the plea:

Q: Okay. I'll show you what's been handed me, a plea form, and do you see your signature on this form?

A: Yes.

Q: Now, this is a three-page plea form. Was this form read to you in Spanish?

A: Yes.

Q: To the best of your understanding and belief, are the statements in here truthful and accurate?

A: Yes.

. . . .

Q: Now, during the negotiations, you were represented by Mr. Norman Smith; is that true?

A: Yes.

Q: Did you have enough time to meet with him before you entered into the plea agreement?

A: Yes.

Q: Did he explain to you the nature of this charge in which you're about to plead guilty to?

A: Yes.

Q: Did he answer all your questions to your satisfaction?

A: Yes.

Q: Are you satisfied with your attorney's representation of you, Mr. Smith?

A: Yes.

Q: And is it true that you did speak to another attorney, Mr. Carlos Ferreira?

A: Yes, I went to see him and this morning, too.

Q: And after speaking to him and speaking with Mr. Norman Smith, are you comfortable in entering a guilty plea to this offense?

A: Yes.

Smith engaged Santos in a short colloquy to establish a factual basis, and the court accepted his guilty plea to third-degree endangering the welfare of a child. On July 11, 2008, Santos was

sentenced to the agreed-upon terms of time served and lifetime parole supervision.

Less than three weeks after he was sentenced, the United States Department of Homeland Security took Santos into custody and served him with an order to appear before an immigration judge. The order indicated that Santos was subject to removal from the United States under section 237(a)(2)(E)(i) of the Immigration and Nationality Act [2] because he had "been convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment." Santos submitted a written statement conceding the truthfulness of the allegations contained in the order and requesting that he be removed to Mexico. On August 14, 2008, the immigration judge found that Santos's request "constitutes a conclusive determination of the alien's removability" and issued an order of removal to Mexico, which was executed three weeks later.

■ Thereafter, Santos illegally reentered the United States in violation of the removal order. The record does not disclose the precise date on which he reentered or his reasons for returning. He was discovered and the Department of Homeland Security again removed him to Mexico after reinstating its removal order on August 17, 2009.[3]

---

[2] 8 *U.S.C.A.* § 1227(a)(2)(E)(i).

[3] At oral argument before this Court, the State raised, for the first time, the contention that under 8 *U.S.C.A.* § 1231(a)(5), a provision of the Federal Immigration and Nationality Act, an alien who illegally reenters the United States is forever barred from legal readmission, even if the underlying reason for the initial removal is later found to be invalid. The State argued that that provision precludes Santos from bringing the instant PCR claim because the ultimate relief he seeks is the reversal of the federal removal order. We requested and received supplemental briefing. After reviewing the parties' arguments, we are satisfied that neither 8 *U.S.C.A.* § 1231(a)(5) nor any other federal statute brought to our attention prevents the courts of this state from considering Santos's claim that his state court conviction was obtained in violation of his right to the effective assistance of counsel.

On August 28, 2009, Santos filed a PCR petition alleging that he had not read, and Smith had not explained, the plea form before he signed it. Santos also argued that his plea lacked an adequate factual basis. Several months after defendant filed the petition, the United States Supreme Court issued *Padilla v. Kentucky*, — *U.S.* ——, 130 *S.Ct.* 1473, 176 *L.Ed.*2d 284 (2010), in which it held that defense counsel has an affirmative duty to inform a criminal defendant of the immigration consequences of a guilty plea. On July 31, 2010, Santos filed an amended petition, adding the allegation that Smith never informed him that deportation was a possible consequence of his plea and contending that he would not have entered the plea had he been properly advised.

A hearing on the petition was held on November 3, 2010, at which the court determined that Santos's allegations that counsel failed to inform him of the immigration consequences of his plea were sufficient to establish a prima facie claim of ineffective assistance of counsel and that Santos was entitled to an evidentiary hearing, which the court scheduled for January 12, 2011. Before the hearing, Santos filed a motion seeking leave to testify telephonically from Mexico. The court converted the January 2011 evidentiary hearing into a hearing on whether to grant the motion, at which Santos's PCR counsel argued that because Santos was barred from reentering the United States to testify in support of his petition, the court should permit him to testify remotely. Counsel asserted that the closest videoconferencing centers to Santos's home in Nocupetaro, Mexico were located ten hours away, and that therefore his only practical option was to appear by telephone. The State opposed the motion, pointing out that telephonic testimony would deny the court the opportunity to evaluate defendant's demeanor and assess his credibility. More fundamentally, the court would have no way of verifying the identity of the person providing the telephonic testimony.

After hearing the arguments, the court granted Santos's motion, observing that the circumstances of the case "not only require but compel that the petitioner be afforded the opportunity to appear

telephonically and testify at a post-conviction relief evidentiary hearing." The court then turned to examine the mechanics of how Santos's testimony would be taken.

> THE COURT: With that said, I'd like to schedule this matter for a hearing on February 16th, that's a Wednesday, at 9:00 a.m. and we will have to have an interpreter here, counsel. So we'll take care of that. But maybe in a letter you can more completely indicate to the Court and copy counsel on exactly logistically how that's going to be handled, is he going to call in here, I think you mentioned a number.
>
> [PCR COUNSEL]: The Court may call out with a calling card or is it better for him to call if he's provided with a phone number?
>
> THE COURT: The phone number that you provided, is that a cell phone number?
>
> [PCR COUNSEL]: No, that's, the place is a booth, they have like six or seven phones on a row.
>
> THE COURT: Is it like a pay phone?
>
> [PCR COUNSEL]: It is a pay phone because he has to pay.
>
> THE COURT: He has a prepaid card?
>
> [PCR COUNSEL]: No, it doesn't work like that. They have, it's like one phone with seven lines and once he finishes talking, they charge him. He doesn't have to enter a card or anything, he can make the call, at the end they bill him.
>
> THE COURT: I see.
>
> [PCR COUNSEL]: But if we call, then I can provide the Court with the calling card to call international. So I think it's better if he calls here.
>
> THE COURT: All right. We'll schedule it for, we're going to schedule it for 9:00 and I'm going to speak with our IT people here and we'll work out the details.
>
> [PCR COUNSEL]: Okay.
>
> THE COURT: Okay. Thank you.

On February 14, 2011, the State filed a motion with the PCR court to stay the evidentiary hearing, which the court denied. The next day, the Appellate Division denied the State's application for permission to file an emergent motion for a stay and for leave to appeal the PCR court's order allowing defendant's telephonic appearance. The State appealed to our Court and we entered an order staying the evidentiary hearing and directing the Appellate Division to hear the State's motion for leave to appeal.

In its brief to the Appellate Division, the State repeated many of the arguments it had made to the PCR court regarding the unreliability of telephonic testimony. In addition, the State attached a certification from Norman Smith challenging Santos's

allegations regarding the quality of his representation. Smith stated that he had advised Santos on three separate occasions that his guilty plea could have immigration consequences and that he had given Santos the name and phone number of an immigration attorney. Smith claimed that Santos declined to speak to the immigration attorney and told Smith on multiple occasions that he had decided to return to Mexico as soon as his legal troubles were sorted out and therefore "did not care" whether he would be deported.

The Appellate Division denied the State's motion for review of the order permitting telephonic testimony, holding that it would be imprudent to conduct interlocutory review without first giving the PCR court the chance to review Smith's affidavit and to explain more fully how Santos's testimony would be taken. To that end, the court extended the stay of the evidentiary hearing for ten days to give the State the opportunity to move for reconsideration before the PCR court. Instead of filing a motion for reconsideration, however, the State moved for leave to appeal before this Court, which we granted on June 7, 2011. *State v. Santos*, 207 *N.J.* 226, 23 *A.*3d 933 (2011).

II.

A.

Some background on the use of telephonic testimony helps set the stage for the important issue that initially caused our intervention in this matter. For centuries, courts have observed the traditional requirement that witnesses deliver testimony in person and in open court. *See, e.g., Crawford v. Washington*, 541 *U.S.* 36, 43, 124 *S.Ct.* 1354, 1359, 158 *L.Ed.*2d 177, 187 (2004) ("The common-law tradition is one of live testimony in court subject to adversarial testing" (citing 3 W. Blackstone, *Commentaries on the Laws of England* 373–74 (1768))). The rule is a function of the adversarial mode of Anglo–American adjudication that encourages litigants, in the elusive search for the truth, to subject opposing

witnesses to rigorous cross-examination. *See State v. Castagna*, 187 *N.J.* 293, 309, 901 *A.*2d 363 (2006) (emphasizing importance and efficacy of cross-examination); *California v. Green*, 399 *U.S.* 149, 158, 90 *S.Ct.* 1930, 1935, 26 *L.Ed.*2d 489, 497 (1970) (describing cross-examination as " 'the greatest legal engine ever invented for the discovery of truth' " (quoting 5 *Wigmore on Evidence* § 1367 (3d ed. 1940))). The rule promotes another core feature of our adjudicatory system: the factfinder's all-important function of observing the demeanor and evaluating the credibility of each witness that comes before the court. *See State v. Locurto*, 157 *N.J.* 463, 474, 724 *A.*2d 234 (1999); *State v. Johnson*, 42 *N.J.* 146, 161, 199 *A.*2d 809 (1964).

As important as live witness testimony is, the *New Jersey Court Rules* do not expressly require it, or directly prohibit remote testimony by telephone. The preference for in-court live testimony can be inferred, however, from the existence of rules that specifically permit remote testimony in distinct and carefully defined situations.

Several court rules, for example, allow parties to introduce transcribed or videotaped depositions in lieu of in-person testimony. *See R.* 3:13–2(a) (allowing taking and use of deposition when material witness is "likely to be unable to testify at trial because of death or physical or mental incapacity"); *R.* 4:14–9 (detailing procedures for taking, and admitting at trial, videotaped depositions); *R.* 4:16–1(c) (allowing admission of deposition at trial "if the court finds that the appearance of the witness cannot be obtained because of death or other inability to attend or testify, such as age, illness, infirmity or imprisonment, or is out of this state").

Other court rules expressly permit witnesses to testify remotely in particular kinds of proceedings. *See R.* 1:20–6(c)(2)(A) (permitting telephonic or video testimony in attorney disciplinary hearing when "special circumstances dictate"); *R.* 1:20A–3(b)(4) (permitting telephonic or video testimony in fee arbitration hearing when "special circumstances dictate"); *R.* 7:8–7(a) (permitting defendant

in municipal court trial to appear "by means of a video link"); *see also R.* 1:6–2(e) (permitting attorneys to deliver oral arguments by telephone in civil matters). We also note that some statutory authorization exists for the taking of remote testimony in specific situations. *N.J.S.A.* 2A:4–30.92(f) (permitting out-of-state witnesses to testify by telephone or video in parentage proceeding); *N.J.S.A.* 2A:34–63(b) (permitting out-of-state witnesses to testify by telephone or video in child custody proceeding).

In sum, our review of the *New Jersey Court Rules* reveals that they do not answer the question in this matter. None address whether a defendant involved in a PCR hearing should be allowed to testify by telephone.

### B.

Decisional law on the subject of whether, and when, a court should permit telephonic testimony is limited. The only published decision in which a court of this state has addressed the matter is *Aqua Marine Products, Inc. v. Pathe Computer Control Systems Corp.,* 229 *N.J.Super.* 264, 551 *A.*2d 195 (App.Div.1988).[4] In that case, the Appellate Division reviewed a contract dispute in which the plaintiff had ordered a specialty machine from the manufacturer defendant, but reneged after the defendant had begun production. *Id.* at 266–67, 551 *A.*2d 195. Ultimately, the defendant sold the machine to another customer whose identity the defendant refused to reveal in discovery. *Id.* at 273, 551 *A.*2d 195. The plaintiff learned the name of the corporate customer during the trial and sought to present testimony from the corporation's

---

[4] It bears mention that the approach to telephonic testimony devised by the Appellate Division in *Aqua Marine* has proven quite influential, having been cited in rule commentaries, treatises, and several high court decisions in other states. *See, e.g., Bonamarte v. Bonamarte,* 263 *Mont.* 170, 866 *P.*2d 1132, 1136 (1994); *State v. Gary F.,* 189 *W.Va.* 523, 432 *S.E.*2d 793, 801 (1993); Biunno, *Current N.J. Rules of Evidence,* comment 1 on *N.J.R.E.* 611(a) (2011); Michael J. Weber, Annotation, *Permissibility of Testimony by Telephone in State Trial,* 85 *A.L.R.*4th 476, 484 (1991).

president. *Ibid.* Because the president resided out of state, the plaintiff sought leave to allow the president to testify telephonically. *Ibid.* The defendant objected, but the trial court determined to allow the testimony, in part because the defendant was to blame for the plaintiff's belated discovery of the customer's identity. *Ibid.*

On appeal, the Appellate Division reversed, holding that it was "grossly and patently improper to admit such testimony over a party's objection." *Id.* at 274, 551 *A.*2d 195. Judge Pressler, writing for the panel, reasoned that "[t]here was no way to ascertain [the witness's] identity, even to assure that he was who he said he was. Beyond that, there was no basis at all on which the indefinable and elusive indicia of credibility, denominated 'demeanor,' could be evaluated by the fact-finder." *Ibid.* After summarizing the various circumstances in the *Court Rules* under which courts may permit a witness, or attorney, to interact with the court via telephone, the Appellate Division observed that

these, of course, are special situations in which there is either exigency or consent and in which the witness' identity and credentials are known quantities. Here there was no special circumstance compelling the taking of telephone testimony and no circumstantial voucher of the integrity of the testimony so taken and no consent.

[*Id.* at 275, 551 *A.*2d 195.]

That passage is the source of a test that has been distilled, and used, by other courts. *See, e.g., Barry v. Lindner,* 119 *Nev.* 661, 81 *P.*3d 537, 542 (2003). The test is comprised of two parts. First, the court must determine whether the opposing party has consented to the testimony or whether there is a "special circumstance," also referred to as an "exigency," "compelling the taking of telephone testimony." *Aqua Marine, supra,* 229 *N.J.Super.* at 275, 551 *A.*2d 195. Second, the court must be satisfied that "the witness' identity and credentials are known quantities" and that there is some "circumstantial voucher of the integrity of the testimony." *Ibid.*

### III.

### A.

The *Aqua Marine* test, described above, is all the guidance that exists in this state on the subject and, as the second part to the test implies, it poses substantial practical and logistical hurdles that an applicant seeking leave to present telephonic testimony must satisfy in order meet the test's demand for preservation of the essential integrity of the testimony. In this matter, the PCR court's determination to allow telephonic testimony failed to address the second part to the *Aqua Marine* test.

Before our Court both parties offered suggestions on how remote testimony could be presented in a way that might satisfy concerns about witness identification, oath administration, and the assessment of witness demeanor. Indeed, the arguments ventured past use of the telephone to more modern forms of video communication, presumably in an effort to satisfy the types of concerns about the integrity of remote testimony addressed in *Aqua Marine*. The intriguing and important issues raised through that argument only augment our initial concern that there should not be a grant of *telephonic* testimony, or even a superior form of video-communication testimony, until and unless there is a satisfactory demonstration that the means to be used will ensure the essential integrity of the testimony for factfinding purposes.

That said, in this matter we need not consider whether it would be appropriate for us to assert original jurisdiction in order to bring this issue to a complete determination. *See R.* 2:10–5 (allowing appellate court to exercise original jurisdiction to eliminate unnecessary further litigation, but discouraging its use if factfinding is involved). We realize that by doing so we would be addressing an evidentiary matter that should be addressed, on the record, in the first instance, by the court from which leave to present such testimony is sought. Suffice it to say that the demonstration must come from the applicant seeking to introduce remote testimony by telephone or other video-communication

means and the trial court's determination to allow use of remote testimony must explain how the essential integrity of the testimony will be preserved for factfinding purposes. However, before any tribunal reaches that essential second part of the *Aqua Marine* test, a more fundamental question has arisen that requires that the trial court re-examine its determination to grant an evidentiary hearing in the matter. That threshold matter— whether Santos is entitled to an evidentiary hearing—must be re-analyzed. Only if the answer to that is in the affirmative would this matter present a legitimate basis for addressing whether, and how, valid testimony, if required, could be properly obtained from Santos from Mexico. *See generally R.* 3:22-10(a) (addressing defendant's entitlement to be present at evidentiary hearing).

## B.

 The PCR court granted Santos an evidentiary hearing premised on the assumption that the Supreme Court's decision in *Padilla, supra,* applied retroactively to Santos. However, *Padilla*'s retroactivity has since been addressed, undermining the premise on which Santos's evidentiary hearing hinges.

In *State v. Gaitan,* we held that the United States Supreme Court's opinion in *Padilla* does not apply retroactively, and that PCR petitioners who entered guilty pleas prior to the issuance of the Supreme Court's *Padilla* decision cannot establish an ineffective assistance of counsel claim simply by alleging that counsel failed to offer advice regarding the risk of removal. *Gaitan, supra,* 209 *N.J.* at 372–73, 37 *A.*3d 1089. Petitions challenging the entry of guilty pleas prior to *Padilla* on ineffective assistance of counsel grounds must be assessed under the law as it existed under *State v. Nuñez–Valdéz,* 200 *N.J.* 129, 975 *A.*2d 418 (2009), which instead focuses on whether counsel provided affirmative misadvice regarding the immigration consequences of a guilty plea. *Gaitan, supra,* 209 *N.J.* at 373–74, 37 *A.*3d 1089. We offered the following guidance to PCR courts, going forward, when they are faced with a claim that counsel provided affirmatively

misleading advice about the immigration consequences of a guilty plea:

> In determining eligibility for an evidentiary hearing in such circumstances, like others where a court may be confronted with competing affidavits between a client and counsel, we trust that courts will evaluate the sufficiency of a belated claim of misadvice before granting a hearing. In so doing, the court should examine the transcripts of the plea colloquy and sentencing hearing ... to determine if either transcript provides support for an after-the-fact assertion that counsel failed to provide advice affirmatively sought by a client as to the immigration consequences of entering into a specific guilty plea, sufficient to justify an evidentiary hearing on the PCR claim.
>
> [*Id.* at 381, 37 *A.*3d 1089.]

Based on the evidence before us, it appears unlikely Santos can satisfy the *Nuñez–Valdéz* standard, as explained in *Gaitan*, which clearly pertains because Santos entered his guilty plea in 2008, two years before the Supreme Court issued *Padilla*. Thus, Santos can only succeed in his ineffective assistance of counsel claim if he demonstrates that counsel provided false information about the immigration consequences of his guilty plea. *See id.* at 373–74, 37 *A.*3d 1089.

We note that Santos does not allege in either his amended PCR petition or in his accompanying certification that counsel provided affirmative misadvice regarding the possibility of deportation. Rather, he avers that "[a]t no time, [counsel] told me that I could be deported based on this conviction and therefore I was not aware of the risk of deportation when I agree to plead guilty." His counsel advanced the same argument during the PCR hearing, relying entirely on the holding in *Padilla* and contending that "[c]ounsel failed to advise Mr. Santos about the risk of deportation he faced for pleading guilty to endangering the welfare of a child in the third degree."

Even if Santos were to allege on remand that counsel affirmatively misinformed him that he *would not* be deported if he pled guilty, it does not appear to us that anything in the record available would support that version of events. As noted, prior to entering his guilty plea, Santos answered "Yes" to Question 17 of the plea form, which at that time read: "Do you understand that if

you are not a United States citizen or national, you may be deported by virtue of your plea of guilty?" He confirmed that in colloquy with the court, which took place prior to the court's acceptance of his plea. That exchange covered Santos's signature on the form, that the form was read to him in Spanish, and that the statements in the plea form signed by Santos were truthful and accurate, which would include his response to Question 17. Further, the colloquy between Santos and the court also addressed the following:

Q: Now, during the negotiations, you were represented by Mr. Norman Smith; is that true?

A: Yes.

Q: Did you have enough time to meet with him before you entered into the plea agreement?

A: Yes.

Q: Did he explain to you the nature of this charge in which you're about to plead guilty to?

A: Yes.

Q: Did he answer all your questions to your satisfaction?

A: Yes.

Q: Are you satisfied with your attorney's representation of you, Mr. Smith?

A: Yes.

Although there exists in the record before us more on the subject, in light of our resolution of this matter, we need not address the matter further.[5] In sum, we conclude that the initial grant of an

---

[5] Santos's allegedly deficient counsel has submitted an affidavit in which he avers that he informed Santos on three occasions that removal was a possible consequence of his guilty plea and advised him to speak to an immigration attorney for more specific advice. On all three occasions, counsel contends that Santos stated that he was unconcerned with any immigration consequences because he planned to return to Mexico with A.A. That account finds independent bolstering from the fact that when the Department of Homeland Security served Santos with an order indicating that he was subject to removal from the United States, Santos responded by submitting a written statement conceding the truthfulness of the allegations and requesting that he be removed to Mexico. Regrettably, the State failed to produce that information until this matter had proceeded to the Appellate Division for interlocutory review. And, therefore, the PCR court has not had the opportunity to consider the record in all its fullness before us, or in light of our decision in *Gaitan*.

evidentiary hearing in which Santos was to be permitted to provide telephonic testimony must be reversed and this matter remanded for full reconsideration by the PCR court as to whether Santos can meet the standard for entitlement to an evidentiary hearing under *Gaitan*, particularly in light of the later-produced affidavit from Santos's defense counsel and related evidence which the PCR court did not have.

## IV.

The judgment of the Law Division is reversed and the matter is remanded for full reconsideration as set forth in detail in this opinion.

JUSTICE ALBIN, dissenting.

The Court granted review of this case to determine whether a post-conviction relief (PCR) petitioner—deported from the country and barred from reentering it—could have his testimony taken by telephone or videoconference at an evidentiary hearing. The Court now remands to the PCR court for consideration under *State v. Gaitan*, 209 *N.J.* 339, 37 *A.*3d 1089 (2012)—a case whose holding will soon be reviewed by the United States Supreme Court in *Chaidez v. United States*, 655 *F.*3d 684, 694 (7th Cir.2011), *cert. granted,* —— *U.S.* ——, 132 *S.Ct.* 2101, 182 *L.Ed.*2d 867 (2012). I would stay the PCR proceedings until the Supreme Court decides whether *Gaitan* is still good law.

*Gaitan* held that a defendant—such as Santos—does not have a constitutional claim for ineffective assistance of counsel if his attorney failed to advise him of the deportation consequences of a guilty plea before *Padilla v. Kentucky*, —— *U.S.* ——, 130 *S.Ct.* 1473, 176 *L.Ed.*2d 284 (2010), decided March 31, 2010. *Gaitan, supra,* 209 *N.J.* at 371, 37 *A.*3d 1089. The United States Circuit Courts of Appeal have split on whether *Padilla's* pronouncement—that a defense attorney has the constitutional obligation to advise his client of the deportation consequences of a guilty plea—should be retroactively or prospectively applied. *See, e.g., Chai-*

*dez, supra,* 655 *F.*3d at 694 (applying *Padilla* prospectively); *United States v. Orocio,* 645 *F.*3d 630, 634 (3d Cir.2011) (applying *Padilla* retroactively). I dissented in *Gaitan,* agreeing with the position taken by the Third Circuit. *Gaitan, supra,* 209 *N.J.* at 382–95, 37 *A.*3d 1089 (Albin, J., dissenting).

On July 26, 2011, this Court ordered a stay of "all litigation involving petitions for post-conviction relief that include claims regarding the application of *State v. Nunez–Valdez,* 200 *N.J.* 129, 975 *A.*2d 418 (2009), and *Padilla v. Kentucky,* —— *U.S.* ——, 130 *S.Ct.* 1473, 176 *L.Ed.*2d 284 (2010)" pending disposition of *Gaitan* by this Court. After the Court ruled in *Gaitan,* the Public Defender moved to continue that stay pending review by the United States Supreme Court. The Attorney General did "not oppose a continuation of [a] global stay" for that purpose.

I voted to grant the global stay. The Court denied the stay motion, despite the lack of opposition. In light of the grant of certiorari in *Chaidez,* the reasons for a stay of this case are even greater now. This Court saw merit in staying PCR proceedings while the issue of the retroactivity of *Padilla* was pending before it. Surely, there is no less merit in granting a stay while that same issue is pending before the United States Supreme Court. I would stay defendant's PCR hearing until the United States Supreme Court has completed its review of *Gaitan.*

For that reason, I respectfully dissent.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—5.

*For dissentment*—Justice ALBIN–1.