[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *White v. King,* Slip Opinion No. 2016-Ohio-2770.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-2770

WHITE, APPELLANT, *v.* KING ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *White v. King,* Slip Opinion No. 2016-Ohio-2770.]

*Open Meetings Act—R.C. 121.22—Definition of "meeting"—R.C. 121.22 prohibits any private prearranged discussion of public business by majority of members of public body regardless of whether discussion occurs face to face, telephonically, by video conference, or electronically by e-mail, text, tweet, or other form of communication.*

(No. 2014-1796—Submitted November 17, 2015—Decided May 3, 2016.)

APPEAL from the Court of Appeals for Delaware County,

No. 14 CAE 02 0010, 2014-Ohio-3896.

_____

SYLLABUS OF THE COURT

R.C. 121.22 prohibits any private prearranged discussion of public business by a majority of the members of a public body regardless of whether the

discussion occurs face to face, telephonically, by video conference, or electronically by e-mail, text, tweet, or other form of communication.

———————————

**O'DONNELL, J.**

{¶ 1} Adam White, a member of the Olentangy Local School District Board of Education, appeals from a judgment of the Fifth District Court of Appeals affirming an order granting judgment on the pleadings in favor of the board in an action involving Ohio's Open Meetings Act, R.C. 121.22. The issue presented on this appeal is whether a series of e-mails between and among a majority of the members of a public body relating to a response to a newspaper editorial, which culminated in the publication of a response that the board later ratified at a public meeting qualifies as a "meeting" for purposes of R.C. 121.22.

### Facts and Procedural History

{¶ 2} At the time pertinent to this matter, the school board consisted of White, Julie Feasel, Kevin O'Brien, Stacy Dunbar, and president David King. The amended complaint alleges that White independently conducted an investigation into alleged improper expenditures by two athletic directors employed by the Olentangy Local School District that resulted in one resigning and both being required to reimburse the district. Thereafter, on September 25, 2012, King, Feasel, O'Brien, and Dunbar amended a board policy to require that all communications between board members and staff first pass through the district superintendent or the district treasurer. White voted against the policy change, and on October 11, 2012, the Columbus *Dispatch* published an editorial entitled "Role Reversal" in which it praised White for his vote and implicitly criticized the other board members for adopting a restrictive policy designed to thwart White from conducting further investigations into suspected illegal spending by district employees.

**{¶ 3}** King then sought to have Feasel, O'Brien, and Dunbar publicly respond to the editorial and directed that they and Superintendent Wade Lucas and district staff members Teresa Niehaus, Linda Martin, and Karen Truett collaborate and issue a response to the editorial on behalf of the board. The board members and district employees did so in a series of e-mail exchanges. O'Brien submitted a proposed response signed by all board members except for White to the *Dispatch*. King then submitted a final response to the *Dispatch* that he signed in his capacity as board president indicating that Feasel, O'Brien, and Dunbar consented to its publication. The *Dispatch* published that response on October 27, 2012.

**{¶ 4}** Approximately six months later, White filed this lawsuit against King, Feasel, O'Brien, and Dunbar, alleging that they had violated the Open Meetings Act. That same day, at a regular board meeting, White advised the board of the lawsuit and moved that "no public monies be spent defending the 4 board members, or in the alternative, if any public monies are spent defending the 4 board members, those members agree to reimburse the district for any monies spent." The motion died for lack of a second. King, Feasel, O'Brien, and Dunbar then voted to publicly ratify the response and deny that the board "violated the Sunshine Law." White abstained from these votes.

**{¶ 5}** The board members answered the complaint and moved for judgment on the pleadings. White then moved for leave to amend his complaint and add the board itself as a defendant. The trial court granted White's motion, ordered the clerk to file the amended complaint instanter, and denied the motion for judgment on the pleadings as moot. In the amended complaint, White sought a declaratory judgment that the board and other board members violated the Open Meetings Act, statutory damages, a temporary restraining order, and injunctive relief. The respondents answered and jointly moved for judgment on the pleadings pursuant to Civ.R. 12(C).

**{¶ 6}** The trial court determined that King, Feasel, O'Brien, and Dunbar had immunity and were entitled to judgment on the pleadings in their individual capacities. The court also granted the board's motion for judgment on the pleadings for three reasons: no prearranged discussion of public business had occurred because the communications among the board members originated with an unsolicited e-mail from King, R.C. 121.22 does not apply to e-mails, and at the time of the e-mail exchange, there was no pending rule or resolution before the board.

**{¶ 7}** On appeal, White challenged the court's ruling only with respect to the board. In affirming, the appellate court held that the definition of "meeting" in R.C. 121.22 does not include sporadic e-mails and that the e-mails did not discuss public business because at the time they were exchanged, there was no pending rule or resolution before the board. And, despite the fact that the board later ratified the response to the editorial, ratification did not retroactively create a prearranged discussion of public business via e-mails. Finally, the appellate court stated that "mere discussion of an issue of public concern does not mean there were deliberations under the statute." 2014-Ohio-3896, ¶ 26.

**{¶ 8}** White has presented two propositions of law, which we accepted:

> Under the Ohio Open Meetings Statute, Ohio Rev. Code §121.22, liberally construed, private deliberations concerning official business are prohibited, whether such deliberations are conducted in person at an actual face-to-face meeting or by way of a virtual meeting using any other form of electronic communication such as telephone, e-mail, voicemail, or text messages.

> Under the Ohio Open Meetings Statute, Ohio Rev. Code §121.22, when a board of education formally votes to ratify a prior

action, the ratified action constitutes "official business" under the Statute.

## Positions of the Parties

{¶ 9} White maintains that he has established an Open Meetings Act violation in that King prearranged a private discussion regarding a response to a Columbus *Dispatch* editorial, a majority of the board members and district staff participated in that discussion in their official capacities, and that discussion resulted in a policy statement that the board later ratified. He also argues that sanctioning public bodies' avoidance of R.C. 121.22 by discussing public business electronically subverts the purpose of the law and that incremental electronic communications violate the law, relying on *State ex rel. Cincinnati Post v. Cincinnati*, 76 Ohio St.3d 540, 668 N.E.2d 903 (1996).

{¶ 10} The board responds that the amended complaint fails to establish that a meeting occurred for purposes of the Open Meetings Act, asserting that the law does not apply to e-mails because it does not mention electronic communications, even though the General Assembly has amended it several times since 2005, when a court of appeals held that it did not apply to e-mail. In addition, the board argues that discussions about a response to a newspaper editorial do not involve public business. Only private deliberations on a pending rule or resolution can violate R.C. 121.22, and in this case, the policy vote occurred before the publication of the editorial, and the board's decision to later ratify its response to the editorial to defend against a lawsuit did not retroactively convert the prior e-mails into a discussion of public business.

## Issue

{¶ 11} The issue here is whether an e-mail discussion by a majority of the members of a public body for the purpose of drafting a response to an editorial

that is subsequently ratified at a public meeting qualifies as a meeting for purposes of R.C. 121.22.

**Law and Analysis**

*Standard of Review*

{¶ 12} In *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 75 Ohio St.3d 565, 570, 664 N.E.2d 931 (1996), we explained:

> Under Civ.R. 12(C), dismissal is appropriate where a court (1) construes the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt, that the plaintiff could prove no set of facts in support of his claim that would entitle him to relief. Thus, Civ.R. 12(C) requires a determination that no material factual issues exist and that the movant is entitled to judgment as a matter of law.

(Citation omitted.)

{¶ 13} "Because the review of a decision to dismiss a complaint pursuant to Civ.R. 12(C) presents only questions of law, our review is de novo." (Citation omitted.) *Rayess v. Educational Comm. for Foreign Med. Graduates*, 134 Ohio St.3d 509, 2012-Ohio-5676, 983 N.E.2d 1267, ¶ 18.

*R.C. 121.22*

{¶ 14} R.C. 121.22(C) provides that "[a]ll meetings of any public body are declared to be public meetings open to the public at all times." A "public body" includes a board of a school district. R.C. 121.22(B)(1)(a). The term "meeting" means "any prearranged discussion of the public business of the public body by a majority of its members." R.C. 121.22(B)(2).

{¶ 15} Nothing in the plain language of R.C. 121.22(B)(2) expressly mandates that a "meeting" occur face to face. To the contrary, it provides that *any* prearranged discussion can qualify as a meeting. Accordingly, R.C. 121.22 prohibits any private prearranged discussion of public business by a majority of the members of a public body regardless of whether the discussion occurs face to face, telephonically, by video conference, or electronically by e-mail, text, tweet, or other form of communication.

{¶ 16} The fact that the discussion in this case occurred through a series of e-mail communications does not remove that discussion from the purview of R.C. 121.22. In *Cincinnati Post*, Cincinnati's city manager, John Shirey, scheduled three series of nonpublic, back to back meetings with members of the Cincinnati City Council regarding the construction of new stadiums for the Cincinnati Bengals and Cincinnati Reds. Less than a majority of council members attended the individual meetings, but a majority of members attended each series of meetings. The Cincinnati *Post* brought a mandamus action in this court to compel the city to prepare and make available to the public minutes summarizing the discussions at the meetings pursuant to R.C. 121.22.

{¶ 17} In granting the writ, we explained that "[t]he statute that exists to shed light on deliberations of public bodies cannot be interpreted in a manner which would result in the public being left in the dark." *Cincinnati Post*, 76 Ohio St.3d at 544, 668 N.E.2d 903. Back to back meetings discussing the same issues of public business could be liberally construed as parts of the same meeting for purposes of R.C. 121.22. Therefore, we held that a majority of council members attended a nonpublic meeting in violation of the statute.

{¶ 18} The distinction between serial in-person communications and serial electronic communications via e-mail for purposes of R.C. 121.22 is a distinction without a difference because discussions of public bodies are to be conducted in a public forum, and thus, we conclude that in this instance, a prearranged discussion

of the public business of a public body by a majority of its members through a series of private e-mail communications is subject to R.C. 121.22. This conclusion is consistent with the mandate of R.C. 121.22(A) that the statute "shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings unless the subject matter is specifically excepted by law." Allowing public bodies to avoid the requirements of the Open Meetings Act by discussing public business via serial electronic communications subverts the purpose of the act. *Compare Del Papa v. Bd. of Regents of Univ. & Community College Sys. of Nevada*, 114 Nev. 388, 392, 397, 400, 956 P.2d 770 (1998) (interpreting definition of "meeting" in Nevada's Open Meeting Law, i.e., a gathering of members of a public body at which a quorum is present to deliberate toward or make a decision on certain matters, to encompass serial electronic communications, consistent with statute stating electronic communication must not be used to circumvent spirit or letter of that law); *Wood v. Battle Ground School Dist.*, 107 Wash.App. 550, 564, 27 P.3d 1208 (2001) (holding exchange of e-mails could constitute a meeting for purposes of Washington's Open Public Meetings Act in light of the act's broad definition of a "meeting," the act's purpose, and the statutory mandate that the act be liberally construed).

{¶ 19} The dissent maintains that our interpretation of the Open Meetings Act amounts to a judicial rewrite of the statute because "[m]eetings differ from other types of communication because they are events or gatherings at which real-time communication can occur." Dissenting opinion at ¶ 30. The dissent states that "[b]ecause a meeting is an event that requires parties to participate at the same time, the requirement is that it be 'prearranged.' R.C. 121.22(B)(2)." *Id.* According to the dissent, here there is "no allegation that discussions were either prearranged or that they occurred in real time," *id.* at ¶ 37, so the e-mails at issue do not qualify as a meeting.

8

{¶ 20} Tellingly, the dissent points to no language in R.C. 121.22(B)(2) requiring real-time communication and instead relies on language in unrelated statutory provisions to support its argument that such a requirement exists. Thus, the dissent's position is not well taken because it necessitates adding language to the General Assembly's definition of a meeting. Additionally, White alleged that King instructed other board members and district staff to collaborate and issue a response to the editorial and that they did so via e-mail on or about October 11, 2012. Thus, White may be able to prove a set of facts to support his claim that the e-mail discussion in this case was prearranged.

{¶ 21} Regarding the "public business" requirement of R.C. 121.22(B)(2), that phrase is " 'commonly understood to mean the business of the government.' " *Associated Press v. Canterbury*, 224 W.Va. 708, 716, 688 S.E.2d 317 (2009), quoting *O'Melia v. Lake Forest Symphony Assn., Inc.*, 303 Ill.App.3d 825, 828, 708 N.E.2d 1263 (1999). "That is, 'the words "public business" * * * relate only to matters within the purview of [a public body's] duties, functions and jurisdiction.' " *Id.*, quoting *Lucarelli v. Freedom of Information Comm.*, Conn.Super.Ct. No. CV 91-0063707S, 1992 WL 209848, *3 (Aug. 18, 1992), and citing *Kansas City Star Co. v. Fulson,* 859 S.W.2d 934, 940 (Mo.App.1993) ("Public business encompasses those matters over which the public governmental body has supervision, control, jurisdiction or advisory power").

{¶ 22} In *Del Papa*, Nancy Price, a member of the Board of Regents for the University and Community College System of Nevada, made comments to the press criticizing the conduct of her fellow regents in selecting the presidents of a university and a community college and an external auditor. At least seven board members expressed concerns about her comments to board chairman James Eardley, and Eardley, in turn, asked Constance Howard, the university's interim director of public information, to draft a response to the comments. Howard drafted a media advisory expressing the board members' concern that Price's

comments were unsubstantiated, incorrect, and damaging to the board and to the university as a whole and stating that the members felt it was important to publicly protest the statements to protect the board's integrity and policy making role. Eardley reviewed the draft and disseminated it by facsimile transmission to all board members except Price, along with a memorandum Howard wrote requesting feedback and advice and stating that the advisory would not be released without board approval. The board members responded by way of telephone calls to Eardley, Howard, or both, charged to university calling cards. Some members disagreed with the use of their names and, in varying degrees, the language of the advisory itself, so Eardley did not issue it.

{¶ 23} In that case, the Nevada Supreme Court held that the board violated the state's Open Meeting Law, which at that time defined a meeting as involving deliberation toward a decision or a decision " 'on any matter over which the public body has supervision, control, jurisdiction, or advisory power.' " *Del Papa*, 114 Nev. at 392, 956 P.2d 770, quoting former Nev.Rev.Stat.Ann. 241.015(2), now (3)(a)(1). The court determined that the board violated a statutory prohibition against closed meetings because it acted in its "official capacity as a public body" in deciding not to take action with respect to the media advisory, emphasizing the board's use of university resources and the fact that the advisory "was drafted as an attempted statement of University policy." *Id.* at 401.

{¶ 24} Similarly, in this case, King allegedly instructed district staff members to assist a majority of board members in preparing a board response to an editorial that criticized one of its decisions. Subsequently, a majority of the board members voted to ratify the board's response at a public meeting, further indicating that the response fell within the purview of the board's duties, functions, and jurisdiction because under the Open Meetings Act, when a board of education formally votes to ratify a prior action, the ratified action constitutes "public business" under the statute. We conclude, in accord with the analysis in

*Del Papa*, that the facts alleged in the amended complaint filed in this case support the conclusion that the e-mail discussion here qualified as a discussion of public business by the board.

### Conclusion

**{¶ 25}** Taking the material allegations in the amended complaint as true and construing all reasonable inferences in favor of White, in accord with *State ex rel. Midwest Pride IV*, 75 Ohio St.3d at 570, 664 N.E.2d 931, we conclude that White may be able to prove a set of facts to support his claim that may entitle him to relief. As demonstrated in this case, serial e-mail communications by a majority of board members regarding a response to public criticism of the board may constitute a private, prearranged discussion of public business in violation of R.C. 121.22 if they meet the requirements of the statute. Accordingly, the judgment of the appellate court affirming the trial court's dismissal of White's complaint pursuant to Civ.R. 12(C) is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Judgment reversed

and cause remanded.

PFEIFER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

LANZINGER, J., dissents with an opinion that O'CONNOR, C.J., joins.

————————————

**LANZINGER, J., dissenting.**

**{¶ 26}** Even when liberally interpreted, R.C. 121.22 has been limited in scope to the meetings of public bodies. I respectfully dissent from the majority's judicial rewrite of what is commonly known as Ohio's Sunshine Law or Open Meetings Act. While it may be a good idea to limit the use of e-mail to avoid statutorily required public meetings, that is the task of the General Assembly and not this court. I would affirm the judgment of the court of appeals, which, in my

view, properly held that the e-mails in this case are not encompassed within the current statutory definition of "meeting."

{¶ 27} The definition of the term "meeting" is found at R.C. 121.22(B)(2) and is relatively simple: " 'Meeting' means any prearranged discussion of the public business of the public body by a majority of its members." In spite of this plain declaration, the majority declares:

> Nothing in the plain language of R.C. 121.22(B)(2) expressly mandates that a "meeting" occur face to face. To the contrary, it provides that *any* prearranged discussion can qualify as a meeting. Accordingly, R.C. 121.22 prohibits any private prearranged discussion of public business by a majority of the members of a public body *regardless of whether the discussion occurs face to face, telephonically, by video conference, or electronically by e-mail, text, tweet, or other form of communication.*

(Emphasis added in part.) Majority opinion at ¶ 15.

{¶ 28} In other words, the majority rewrites R.C. 121.22(B)(2) to redefine "meeting" to include all forms of communication, even though the statute does not refer to e-mail correspondence or anything like it. The Fifth District and two other appellate courts have refused to apply the statute to cover e-mails. *See Haverkos v. Northwest Local School Dist. Bd. of Edn.,* 1st Dist. Hamilton Nos. C-040578 and 040589, 2005-Ohio-3489, 995 N.E.2d 862, ¶ 9 ("Ohio's Sunshine Law does not cover e-mails"); *Radtke v. Chester Twp.*, 11th Dist. No. 2014-G-

3222, 2015-Ohio-4016, 44 N.E.3d 295, ¶ 31 ("the Open Meetings Act does not apply to e-mails").

{¶ 29} In expanding this case to include all forms of "communication" in its interpretation of "meeting," the majority reaches into areas well beyond those covered by R.C. 121.22.

{¶ 30} It is critical to remember that Ohio's Sunshine Law relates to open meetings. Meetings differ from other types of communication because they are events or gatherings at which real-time communication can occur. *See, e.g.*, R.C. 1745.21(C) (meeting involves contemporaneous communication); R.C. 5312.04(D) (essential component of meeting is ability to communicate in real time). Because a meeting is an event that requires parties to participate at the same time, the requirement is that it be "prearranged." R.C. 121.22(B)(2).

{¶ 31} We focused on the essential concept of a "meeting" as it applies to the Sunshine Law in *State ex rel. Cincinnati Post v. Cincinnati*, 76 Ohio St.3d 540, 668 N.E.2d 903 (1996). And we considered the three parts of the statutory definition:

> A liberal construction of the definition of "meeting" would include the back-to-back sessions held by [city] council in this case. The elements of the statutory definition of a meeting are (1) a prearranged discussion, (2) a discussion of the public business of the public body, and (3) the presence at the discussion of a majority of the members of the public body. The council meetings certainly fit within the first two elements. As to the third element, back-to-back sessions discussing exactly the same public issues can be liberally

13

> construed as two parts of the same meeting. A majority of council members thus did attend the "meeting."

*Id.* at 543.

{¶ 32} In *Cincinnati Post*, we held that the city council's private back-to-back meetings, which, taken together, were attended by a majority of council members, violated R.C. 121.22. We noted the importance of meeting attendance rather than mere discussions between members:

> The statute does not prohibit impromptu hallway meetings between council members—the statute concerns itself with prearranged discussions. It does not prohibit member-to-member prearranged discussions. *The statute concerns itself only with situations where a majority meets.* Although a majority of council members were not in the same room at the same time, *a majority of them did attend a prearranged meeting* to deliberate on issues of great interest to the public.

(Emphasis added.) *Id*. at 544.

{¶ 33} The majority cites statutes and public policy found in other jurisdictions, but they of course have different statutes. And the policy of liberal interpretation does not stretch so far as to purge all the meaning from a statutory term. The purpose of the Sunshine Law is to "require public officials to take official action and to conduct all deliberations upon official business only in open meetings," as R.C. 121.22(A) explains. We have considered the liberal

application of R.C. 121.22 in a case in which it was argued that informal meetings were not subject to the Open Meetings Act or its requirement for minutes. *State ex rel. Fairfield Leader v. Ricketts*, 56 Ohio St.3d 97, 102, 564 N.E.2d 486 (1990).

{¶ 34} There we held that the act covers "more than just meetings authorized by a public body," but that it "also refers to any meeting that the public body causes to take place." *Id.* at 102. The key is that "the members of a public body agree to attend, in their official capacity, a meeting where public business is to be discussed and a majority of the members do attend * * *." *Id.*

{¶ 35} This is not to say that discussions through e-mails could *never* constitute a meeting. For instance, a board member could communicate independently with a majority of his or her fellow board members and prearrange for each of them to be available to send and receive e-mails at a specific day and time. The other board members could be anywhere—on a plane, at work, or at a child's soccer practice—at the prearranged moment, but they all could still access their e-mails. The initiating board member would need to send only one e-mail jointly addressed to all of the awaiting board members, who, by replying to all addressees, could then engage in what is essentially a prearranged and real-time discussion with a majority of their fellow board members about a matter of public business. I believe that such a situation could constitute a "meeting" within the definition of that term in R.C. 121.22(B)(2).

{¶ 36} Given the General Assembly's exhortation that the Open Meetings Act "shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings," R.C. 121.22(A), we must be wary of any attempt to avoid the transparency that the public deserves. As one commentator recently noted:

As technological advances revolutionize communication patterns in the private and public sectors, government actors must consider their reactions carefully. Public representatives may take advantage of modern technology to improve communications with constituents and to operate more efficiently. However, this progress must be made with an eye to complying with certain statutory restrictions placed on public bodies.

(Footnote omitted.) Roeder, *Transparency Trumps Technology: Reconciling Open Meeting Laws with Modern Technology*, 55 Wm. & Mary L.Rev. 2287, 2288 (2014).

{¶ 37} However, in this case there is no allegation that discussions were either prearranged or that they occurred in real time. Therefore, the subject e-mails do not qualify as a "meeting" as the term is currently defined.

{¶ 38} It may well be a good idea for the General Assembly to consider expanding the reach of the law to prohibit a majority of members of a public body from e-mailing each other to avoid the Sunshine Law. It should reexamine the law and take action to ensure that the Sunshine Law will continue to promote transparency in government as technology changes.

{¶ 39} But a majority of this court should not add language that has not been fully considered by the public's legislative representatives. The unintended consequences of broadening the word "meeting" beyond its current definition could affect adversely how members of public bodies do their business.

{¶ 40} I would affirm the judgment of the court of appeals.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Phillip L. Harmon, Attorney at Law, L.L.C., and Phillip L. Harmon, for appellant.

Crabbe, Brown & James, L.L.P., and John C. Albert, for appellees.

Baker Hostetler, L.L.P., and David L. Marburger, urging reversal for amici curiae, Ohio Coalition for Open Government, Common Cause Ohio, and the League of Women Voters of Ohio.

_____